Harold G. WELLS

v.

John HUTCHINSON, Director of Texas Agricultural Extension Service, the Commissioners Court of Panola County, Texas.

No. TY–75–69–CA.

United States District Court, E. D. Texas, Tyler Division.

Aug. 25, 1980.

Larry R. Daves, Tyler, Tex., for plaintiff.

William C. Bednar, Jr., Asst. Atty. Gen., LeRoy LaSalle, Carthage, Tex., H. Kelly Ireland, Tyler, Tex., for defendants.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

### Introduction

There are 254 counties in Texas; Panola County is the only one not served by the Texas Agricultural Extension Service.[1] The events which led to this curious situation are in issue in this civil action.

The plaintiff, Harold Wells, a black man, is a former employee of the Texas Agricultural Extension Service ("TAES"). Wells worked in Panola County, Texas, as a TAES employee, from October 1964 through 1974.

Two groups of defendants are present in this civil action, the state defendants and the county defendants. The state defendants include the Texas Agricultural Extension Service and its former director, John Hutchinson. The county defendants include Panola County, its governing body, the Commissioners Court of Panola County, and the individual members of the Court, Commissioners Ford, Brooks, Rich, and Davis, and Danny Buck Davidson, the County Judge of Panola County.[2]

Plaintiff contends that, throughout his employment, he was the victim of impermissible racial discrimination. Wells asserts that defendants: (1) maintained a segregated employment environment; (2) discriminated against him in his job assignment, assignment of responsibilities, and promotion; (3) paid him a lesser salary than white workers because he was black;[3] and (4) discharged him because of formal and informal allegations of racial discrimination that he made against his employers. Wells bases his employment discrimination claims on Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e–5, the Civil Rights Act of 1870, 42 U.S.C. § 1981, and the Civil Rights Act of 1871, 42 U.S.C. § 1983. The defendants severally deny all of Wells' claims of racial discrimination.

### I.

### TAES IN TEXAS AND PANOLA COUNTY

As a prelude to discussion of plaintiff's claims, it is important to describe the na-

---

1. Hereafter, the Texas Agricultural Extension Service will be referred to as either "TAES," "the extension service," or "the service."

2. Each of the County Commissioners of Panola County was a Commissioner during some period of Wells' employment, and each of them was a Commissioner at the time of Panola County's termination of its contribution to

TAES. County Judge Davidson assumed office after the occurrence of acts upon which this action is based; he is a defendant only for purposes of assuring adequacy of relief.

3. Refer to the Appendix for a breakdown of the salaries received by TAES employees in Panola County from 1968 through 1974.

ture of the Texas Agricultural Extension Service.[4] TAES is a cooperative extension service, operating on funds received from the federal government, the state of Texas, and the county government of each county within which it operates. TAES's roots can be traced to the Smith–Lever Act of 1914, 38 Stat. 372, 7 U.S.C. § 341 et seq., in which Congress provided for partial federal funding of state agricultural extension services. The federal funds were channeled through the United States Department of Agriculture to the state extension services, who were expected to work in cooperation with the Department. Congress contemplated that these federal funds were to go to the land grant college selected by the legislature in a particular state, to be used to disseminate "useful and practical information on subjects relating to agriculture and home economics."

Prompted by the federal legislation, the Texas legislature passed a resolution in 1915 which created the Texas Agricultural Service. Consonant with the federal enabling statute and its educational mission, TAES was established as, and continues to be, a part of Texas A&M University. The principal offices of TAES are located at the University including the offices of TAES's director. The Director is at the head of TAES's organization, reporting to the President of Texas A&M University through the Dean of Agriculture. Defendant Hutchinson served as Director of TAES throughout all of the years that plaintiff was employed by TAES. Below the state level, TAES is organized into districts. Each district is supervised by a district agent, who oversees extension work in the counties which comprise the district.

Each county within a district is served by several TAES employees. Principally, these include county agricultural extension agents and county home demonstration ex-

tension agents. This civil action focuses almost exclusively on the agricultural extension component of the county extension services. It is the duty of agricultural extension agents to inform and advise county residents, *inter alia*, as to the best methods for raising livestock, growing crops, raising timber, and conducting other activities associated with farm and ranch industries. To this end, they also supervise youth clubs designed to impart such information. Similarly, agricultural agents visit citizens in their homes and at their farms and ranches, speak to citizens at public meetings, and communicate information through the communications media. County agricultural agents maintain offices, which citizens may visit to obtain answers to such questions as they might have. In essence, the agricultural agents are informational links between the universities, where new concepts and methods are developed, and the persons in the field who can ultimately implement those concepts.

Shortly after the creation of TAES in 1915, the Texas legislature created a Negro Agricultural Extension Service. This all–black extension service was maintained until the passage of the Civil Rights Act of 1964. The black and white extension services were entirely segregated, with the black services operating completely parallel to the equivalent white components. The black service employed only black personnel, served only black residents of Texas, and operated out of an all–black university, Prairie View A&M University in Prairie View, Texas, which is a component of the Texas A&M University. The white extension service consisted only of white personnel, operated out of an all–white university, and served only white Texas residents. The sole overlap between the two "separate but equal" services occurred when the state

---

4. This civil action is remarkably similar to *Wade v. Mississippi Cooperative Extension Service*, 372 F.Supp. 126 (N.D.Miss.1974), aff'd in relevant part, 528 F.2d 508 (5th Cir. 1976), on remand, 424 F.Supp. 1242 (N.D.Miss.1976). Both the facts presented and the illegalities exposed parallel this case in most relevant particulars. The most significant difference be-

tween this civil action and *Wade* is that the latter was a class action involving the entire extension program in Mississippi. *Wade* is not cited throughout this order; to cite it for relevant propositions would involve citations in most paragraphs. Reference is made to *Wade* for a better understanding of the facts and law presented in this memorandum opinion.

leader for the black service reported to the TAES director located at College Station, Texas. Harold Wells entered the TAES system in April 1963, when he interviewed with Reuben A. Sanders, Negro District Agent, to obtain a position with the black extension service. Thus, the dual system described above was the system which Wells entered, when Sanders hired him to be a junior assistant agricultural agent in Harrison County, Texas.

The Harrison County position was merely a training position. In October 1964, Wells became Negro assistant county agent in Panola County. In a short while, he advanced to the position of Negro county agent for Panola County. Panola County's white extension agent at the time was Alfred Croix. Wells operated the black extension service out of offices in an all–black local school; Croix's office, and the offices of the white extension service, were located in the Panola County courthouse. It is noteworthy that the white extension service in Panola County had a full–time secretary and a janitor, whereas the black service was not provided these positions. The salaries of the secretary and janitor for the white service in Panola County were paid by Panola County; no similar contribution was made to the black service.

As a cooperative extension service, operating with federal, state, and county funds, every extension agent's salary is comprised of contributions from all three levels of government. Each of these governmental units made lower contributions to Wells' salary than to the white county agent. Wells' total salary was, therefore, lower than the total salary of Alfred Croix, the white agent. Although Wells and Croix performed essentially identical duties as county agent, TAES and Panola County attempted to justify the salary disparity by reference to the number of residents that each agent served, i. e., there were more white than black residents in Panola County. It was asserted that this difference created a difference in the amount of work required of white and black agents, thereby justifying the salary disparity.

The situation which prevailed in Panola County, Texas, was present in all Texas counties in which both a white and a black extension service operated. Counties with black populations considered to be insignificant had no black county agent. Because most counties with large black populations were located in the eastern portion of Texas, the black extension service was concentrated there. In every county with a black agent, he was paid less than his white counterpart. A justification paralleling Panola County's was offered by all such counties as to these marked salary disparities. In sum, black extension work across the state of Texas was segregated from white extension work, and all black agents received significantly lower salaries than did their white counterparts performing the same duties.

Shortly after Wells became Negro county agent, his title—and the title of all Negro county agents in Texas—was changed to associate county agent. The only change was in the title, for all job responsibilities remained the same. The black and white services remained segregated. No Negro county agent became a county agent, because the latter job was for a white man. Hence "associate agent" became the virtual title for black extension agents. All black agents were associate agents, and only a very small handful of white agents had the title of associate agent (usually temporarily, pending promotion). Associate agents continued to receive lower total salaries and lower contributions from each of the three governmental levels than did their white counterparts.

As a direct result of the Civil Rights Act of 1964 and the consequent pressure from the United States Department of Agriculture, the Texas Agricultural Extension Service began to merge the white and black extension services in 1965. The abolition of dual lines of supervision and administration was the first step. As a practical matter, the Negro extension service disappeared and was absorbed into the white extension service. The Prairie View A&M extension facilities were abolished, and all extension service activity was directed through Texas

A&M University. As was the case in most counties, the black extension offices in Panola County disappeared. Wells moved his office from the all–black school to the Panola County Courthouse. After the merger, it could be said that only one extension service operated in Texas. However, black agent jobs and white agent jobs still existed, black agents being called "associate agents" and white agents being called "county agents." An agent's niche in this system was determined by his race. Salaries were similarly determined. Each governmental entity continued to contribute less to black than to white agents.[5]

One more change occurred in TAES's organization, after the merger of the black and white services. This encompassed the creation of the new positions of "county chairman" and "county program leader" in each Texas county. No black agent received either title. All county chairmen and county program leaders were white and were drawn from the corps of all–white county agents. In Panola County, Alfred Croix was designated county chairman and county program leader.

Wells continued in his position as associate agent, drawing a lower salary than his white counterpart, Alfred Croix, until 1972. As always, each governmental unit contributed less to Wells' salary than to Croix's salary, and Wells drew a lower total salary than did Croix.[6] On January 15, 1972, Croix resigned from the Texas Agricultural Extension Service. From January 15, 1972, until March 15, 1972, Wells performed his own duties and those formerly performed by Croix, although he continued to receive the same pay he had been receiving. At this juncture, Wells informed his supervisor of a desire to receive Croix's title; the supervisor stated that he would look into the possibility. The members of the Commissioners Court of Panola County indicated, however, that no black person would be acceptable in the position of county agent; therefore, the extension service did not accord Wells the title.

Gordon Ford, a white man, was afterwards employed to replace Alfred Croix. Ford was named county agent, county chairman, and county program leader. Ford began work at the salary that Croix had been receiving, and Wells continued to receive the same lower salary that he had been receiving. The presence of the new agent, then, changed nothing, since there continued to be a white agent's position and title, a black agent's position and title, and pay levels established on a racial basis.

5. A 1966 United States Department of Agriculture audit report contained the following analysis:

The Texas Cooperative Extension Service employs 94 Negro professionals who are assigned to one of 57 county extension offices along with 148 white professionals. Comparison of the salaries paid to the 242 negro and white professional employees assigned to the 57 counties disclosed that with one exception, the white professional is paid the higher salary. Also the average salary of the white professional is substantially more than the average salary of the negro professional, although the educational background is similar and the average length of service of the Negro professional employee is about five years more than the white employee.

6. In the East Texas district in which Panola County is situated, in 1972, the average black agent with a master's degree was paid $1,038.00 less than the average caucasian agent with a master's degree. Furthermore, the average black agent with a bachelor's degree was paid $1,205.00 less than the average caucasian

agent with a bachelor's degree. In 1973, the average black agent with a master's degree was paid $1,724.00 less than the average caucasian agent with a master's degree. Also, the average black agent with a bachelor's degree was paid $1,088.00 less than the average caucasian agent with a bachelor's degree. In 1974, the average black agent with a master's degree was paid $1,345.00 less than the average caucasian agent with a master's degree, while the average black agent with a bachelor's degree was paid $836.00 less than the average caucasian agent with a bachelor's degree. In 1975, the average black agent with a master's degree was paid $908.00 less than the average caucasian agent with a master's degree, while the average black agent with a bachelor's degree was paid $330.00 less than the average caucasian agent with a bachelor's degree.

Plaintiff's Exhibit No. 5 illustrates that as of September 1, 1974, eleven out of twelve counties in the district in which Panola County is located contributed less to the black agent in the county than to the white agent.

After the decision to confer Alfred Croix's titles on Gordon Ford instead of Wells, the latter began to complain relative to his discriminatory job assignments and salary levels. On December 3, 1973, Wells filed an employment discrimination charge, against the Commissioners Court of Panola County, with the Equal Employment Opportunity Commission ("EEOC"). After these complaints and the EEOC charge, the County Commissioners decided to eliminate county funding of TAES services in Panola County. It is not clear when or how this decision was reached; it is probable, however, that it was reached prior to September 10, 1974. The applicable statutes provide that the Texas Agricultural Extension Service can operate in a particular county, only if the county contributes to the operation of the county program. Because Panola County discontinued its contribution to the operation of TAES in Panola County after December 31, 1974, the extension service program in the county was discontinued, beginning January 1, 1975.

After the termination of TAES work in Panola County, both Ford and Wells became agents–at–large, employed by TAES. TAES made it clear to Wells and Ford that they would be permitted to work at full pay for ninety days as agents–at–large, but that it would be necessary that they choose a permanent position in another county. The only option given Wells and Ford was to leave the employ of the Texas Agricultural Extension Service. Ford eventually took a job as county agent in Wood County, Texas. TAES offered Wells the position of county agent in Limestone County, Texas, but he declined the offer. Similarly, he chose not to apply for positions throughout the state which were listed in TAES job vacancy announcements. Eventually, TAES informed Wells that it was compulsory that he take a job in a particular county or else resign. Because Wells would do

neither, TAES terminated his employment on June 30, 1975.

Finally, as a preface to a legal analyses of plaintiff's claims, it would be useful to set forth a list of dates which will be relevant to the analyses.

| Event | Date |
|---|---|
| EEOC charge filed naming Commissioners Court | 10–03–73 |
| EEOC charge amended to include TAES | 9–26–74 |
| Civil action filed against Commissioners Court and TAES alleging Sections 1981 and 1983 violations | 12–26–74 |
| Complaint in civil action amended to include Director Hutchinson, County Judge, and Commissioners | 1–15–75 |
| Right to sue letter | 2–21–75 |
| Complaint in civil action amended to include Title VII allegations | 5–02–75 |

## II.

### TITLE VII FORMALITIES

Plaintiff's Title VII claims are directed against TAES and the Commissioners Court of Panola County. Although no party raised the issue of legislative immunity, it appears that the Commissioners Court and the individual commissioners benefit from an absolute legislative immunity, insulating all of these parties from lawsuits seeking equitable relief arising out of decisions made, and actions taken, by the Commissioners Court concerning Wells' employment and the operation of TAES in Panola County. *See Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *Universal Amusement Co. v. Hofheinz*, 616 F.2d 202, 205 (5th Cir. 1980); *Green v. DeCamp*, 612 F.2d 368, 371–72 (8th Cir. 1980); *Rhevark v. Shaw*, 477 F.Supp. 897, 921–25 (N.D.Tex.1979).[7] Because, first,

---

7. Similarly, it could be argued that the County Judge does not enjoy the legislative immunity shared by the Commissioners Court itself and the individual commissioners. The Fifth Circuit has explained the four different roles of the county judge in Texas: judicial, legislative, ad-

ministrative and executive. *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980). The Supreme Court has indicated that the immunity an individual enjoys may depend on the nature of the action in question, rather than his official position. *Imbler v. Pachtman*, 424 U.S. 409, 96

the United States Supreme Court has explicitly left open the issue of legislative immunity for county legislators and legislative bodies, *Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 404 n. 26, 99 S.Ct. 1171, 1179 n. 26, 59 L.Ed.2d 401 (1979), and second, Title VII's amendment to include state and local employees may be said to have removed this legislative immunity for county legislative decisions resulting in employment discrimination, *see Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, 370 & n. 26, 97 S.Ct. 2447, 2456 & n. 26, 53 L.Ed.2d 402 (1977) (Title VII amended to include state and local employees), the applicability of absolute legislative immunity to the Panola County Commissioners Court's defense of plaintiff's Title VII allegations is not certain. Nevertheless, the issue of legislative immunity need not detain further analysis of plaintiff's claims. The only manner in which Panola County can act is through its Commissioners Court; hence, a suit against the Commissioners Court is actually a suit against Panola County itself. *See Monell v. Department of Social Services*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2036, n. 55, 56 L.Ed.2d 611 (1978); *Kingsville Independent School District v. Cooper*, 611 F.2d 1109, 1112 (5th Cir. 1980); *Bogard v. Cook*, 586 F.2d 399, 410 (5th Cir. 1978). *Cf. Gay Students Services v. Texas A&M University*, 612 F.2d 160, 164 (5th Cir. 1980) (official capacity suits are actually suits against governmental entity represented by official). *See also McCulloch v. Glasgow*, 620 F.2d 47, 52 (5th Cir. 1980). Consequently, there is no reason that the Title VII allegations cannot be analyzed as applying to Panola County and seeking appropriate relief from the county. *See Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 731, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980).

Defendants contend that this court is without jurisdiction to decide the Title VII issues presented by plaintiff. These jurisdictional defenses relate to the intricate pattern of time requirements established in the Title VII framework. The most serious jurisdictional defense raised concerns the 180–day time limit within which to file an EEOC charge after an alleged discriminatory act.

■ In order to base a court action on an alleged act of employment discrimination, an aggrieved employee must file a charge with the EEOC within 180 days of that act of employment discrimination. *Crawford v. Western Electric Co.*, 614 F.2d 1300, 1306–09 (5th Cir. 1980); *Hoffman v. Boeing*, 596 F.2d 683, 685 (5th Cir. 1979); *Green v. Forney Engineering Co.*, 589 F.2d 243, 246 (5th Cir. 1979); *East v. Romine, Inc.*, 518 F.2d 332, 336 (5th Cir. 1976). Defendants argue that plaintiff cannot base this civil action on their failure to give him Croix's job when it became vacant in early 1972, noting, specifically, that plaintiff filed his EEOC charge against the Commissioners Court of Panola County on December 3, 1973, about one and one–half years after Ford was awarded Croix's position in Panola County. Based on this calculation, defendants assert that the failure to place Wells in Croix's job, for whatever reason, cannot be judicially determined to be a Title VII violation.

■ Defendants would be correct, had plaintiff simply alleged and proved that he continued to suffer the ill effects of a single violation of Title VII, occurring more than 180 days before the filing of his EEOC charge, *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), for merely alleging the continued effects of a past Title VII violation does not

S.Ct. 984, 47 L.Ed.2d 128 (1976). Likewise, the Fifth Circuit has analyzed the immunity enjoyed by a county judge in Texas in terms of the nature of the action in question. *Familias Unidas v. Briscoe*, 619 F.2d 403–404. It does not appear that any action taken by the County Judge of Panola County in connection with plaintiff's employment was a judicial act. *See Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct.

1099, 55 L.Ed.2d 331 (1978). Whether actions taken by him concerning Panola County's funding of TAES and Wells' employment were legislative rather than executive or administrative is unclear. For the reasons stated in the text, however, this lack of clarity will be ignored. It will be assumed that an absolute legislative immunity applies, and Panola County will be treated as the defendant.

suffice to identify an infraction which occurred during the 180–day time frame. However, plaintiff alleged much more than the mere continued effect of a past violation; he charged that he was the victim of a *policy* of discrimination which continued into the 180–day period. He alleges that the very structure of the extension service in Panola County was discriminatory—that his working environment was riddled with discrimination and, indeed, designed to perpetuate a dual system of extension service activity. Respecting this contention, plaintiff did not assert the mere effects of past discrimination, he maintained the existence of actual discrimination, taking the form of a dual system. Under this arrangement, plaintiff argued, he was continuously disadvantaged in promotional opportunities, the assignment of job responsibilities, and pay. In essence, his claim is, that he was paid less because he was black,[8] and that his lower pay was justified by reference to a system whose very structure was intended to assure that black workers continued to receive lower salaries and lower positions.[9] Such allegations allege a "continuing violation" of Title VII and satisfy Title VII's 180–day requirement. *See, e. g., Satz v. ITT Financial Corp.*, 619 F.2d 738, 743–44 (8th Cir. 1980); *Moore v. City of San Jose*, 615 F.2d 1265, 1274 (9th Cir. 1980) ("A pervasive policy of systematic discrimination is a continuing violation of Title VII."); *Fisher v. Proctor & Gamble Manufacturing Co.*, 613 F.2d 527, 540 (5th Cir. 1980) ("[W]here an entire promotion system is challenged on the basis that it operates to hold plaintiffs 'in lower echelons,' the 180 day statutory period is inconsequential in determining the admissibility of prior discriminatory acts."); *Gonzales v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 249 (5th Cir. 1980) ("Where an employee charges an employer with continuously maintaining an illegal employment practice, he may file a

valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice."); *Clark v. Olinkraft, Inc.*, 556 F.2d 1219, 1222–23 (5th Cir. 1977). *See generally Dumas v. Town of Mount Vernon*, 612 F.2d 974, 977–78 (5th Cir. 1980) (failure to promote usually considered continuing violation); *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1057–58 (5th Cir. 1979); *Patterson v. American Tobacco Co.*, 586 F.2d 300, 304 (4th Cir. 1978); *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 986–88 (D.C.Cir.1973).

As another reason why the 180–day requirement has been met, plaintiff alleged that the termination of TAES operation in Panola County was done in retaliation for his informal and formal complaints of employment discrimination. This claimed retaliation occurred after Wells' December 3, 1973, charge against the Commissioners Court of Panola County and before the amendment of the charge on September 26, 1974, so as to include TAES. The September 26th amendment occurred within 180 days of the August decision to terminate county funding of extension service activity in Panola County. Although the amendment served to bring in an additional party, it is to be noted that it also was instrumental in charging acts of discrimination occurring within 180 days of the amendment.

■ Defendants also assert a fatal variance between plaintiff's judicial complaint and his Title VII charge. Plaintiff's charge before the EEOC complained of disparate pay levels between himself and white agents in Panola County. In his amended complaint in this civil action, plaintiff specifies, more particularly, allegations of discriminatory promotions, unequal pay for racial reasons, and retaliatory discharge. It has already been determined that the pro-

---

**8.** Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). .

**9.** Title VII makes it unlawful for an employer "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race." 42 U.S.C. § 2000e–2(a)(2).

motion allegation cannot serve as a basis for this Title VII cause of action; therefore, it is unnecessary to consider the variance allegation in this respect. With regard to the claims of discriminatory pay and retaliatory discharge, defendants' contention is without merit. "[T]he 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970). Plaintiff's claim as to pay in this civil action is substantially identical to the claim presented to the EEOC for investigation and possible conciliation, because the retaliatory discharge claim is virtually inseparable from the pay claim, *i. e.*, the basis of the first claim resulted from the assertion of the latter. Moreover, the EEOC could not have missed the retaliation claim in conducting its investigation. As will hereafter be made clear, plaintiff's allegations of discrimination are intimately related; they cannot be compartmentalized for analysis, for each is part of a system of discrimination. Defendants were aware of plaintiff's allegations at the time of the filing of the EEOC charge, as was the EEOC. As such, defendants will not be heard to argue that they are presently being sued for activity not subject to EEOC investigation and conciliation. *See EEOC v. Brookhaven Bank & Trust Co.*, 614 F.2d 1022, 1025 (5th Cir. 1980);[10] *Silver v. Mohasco*, 602 F.2d 1083, 1090 (2d Cir. 1979); *Hicks v. ABT Associates*, 572 F.2d 960, 966 (3d Cir. 1979); *EEOC v. General Electric Co.*, 532 F.2d 359, 364–65 (4th Cir. 1976). *See generally Love v. Pullman*, 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972) (EEOC charges should not be technically construed); *Gamble v. Birmingham Southern Railroad Co.*, 514 F.2d 678 (5th Cir. 1975); *Drew v. Liberty Mutual*, 480 F.2d 69 (5th Cir. 1973).[11]

■■ Defendants TAES and the Commissioners Court of Panola County further contend that they cannot be held liable to plaintiff under Title VII, because plaintiff filed this civil action before receipt of a right–to–sue letter from the EEOC. The error in defendants' contention lies in the fact that "this civil action" comprises a number of different causes of action. On December 26, 1974, plaintiff filed suit against TAES and the Commissioners Court of Panola County alleging causes of action pursuant to 42 U.S.C. §§ 1981 and 1983. Although defendants are correct that filing of this civil action preceded plaintiff's receipt of his right–to–sue letter on February 21, 1975, it does not follow that plaintiff's Title VII civil action preceded receipt of

10. In determining whether the EEOC has properly added new charges in the complaint filed with the court, two countervailing policies must be considered. The first is the policy to expedite the judicial process. To limit the EEOC to the precise charge filed would serve no purpose except to add greater delay and expense to the enforcement proceedings. The second is the policy that employees should have the opportunity to settle with the EEOC and all aggrieved parties before court action is initiated. If the employer has notice of the charge and has been offered an opportunity to remedy the problem without litigation, it should not.be allowed to avoid enforcement of the law because the original charge filed with the EEOC by the aggrieved party is slightly different from the complaint filed in court by the EEOC. *EEOC v. Brookhaven Bank & Trust Co.*, 614 F.2d 1022 (5th Cir. 1980).

11. In *Staz v. ITT Financial Corp.*, 619 F.2d 738 (8th Cir. 1980), plaintiff filed an EEOC charge alleging discrimination in pay and promotion. In addition to the two allegations mentioned in the EEOC charge, plaintiff filed suit, alleging the "discriminatory denial of training opportunities and assignment of job duties." *Satz v. ITT Financial Corp.*, 619 F.2d 738, 741 (8th Cir. 1980). The Court of Appeals noted: "In this case there is no dispute that the allegations of discrimination in training opportunities and job assignments are like and related to the substance of appellant's EEOC charge; therefore, all allegations in the complaint are properly before the court on the basis of appellant's single EEOC charge." *Id.* at 742. At least this much can be said of the relationship between Wells' EEOC charge and his judicial complaint. The EEOC charge made it clear that Wells' central grievance concerned a general pattern of disparate treatment in his Panola County employment, resulting in lower salary. This complaint underlies all of the legal claims that Wells has placed before this court.

that right–to–sue letter. In fact, plaintiff amended his complaint on May 2, 1975, within ninety days after receipt of the right–to–sue letter, to include a cause of action against TAES and the Commissioners Court of Panola County pursuant to Title VII. *See Hoffman v. Boeing,* 596 F.2d 683, 685 (5th Cir. 1979) ("The timely filing of an administrative complaint is a condition precedent to bringing a discrimination suit under Title VII."). Because Title VII remedies are separate and distinct from other statutory remedies, a Title VII cause of action may be asserted independently of, or in sequence to, these other statutory causes of action; thus, plaintiff's assertion of causes of action under sections 1981 and 1983 prior to receipt of a right–to–sue letter was valid, since his right to sue under those statutes was unaffected by Title VII requirements. Similarly, his filing of a Title VII cause of action was valid, by reason of the fact that it was made following receipt of a right–to–sue letter, thus being unaffected by the previous assertion of separate, independent statutory causes of action. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975) (Title VII and section 1981 remedies "are separate, distinct, and independent"). *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 48–49, 94 S.Ct. 1011, 1019–20, 39 L.Ed.2d 147 (1974) (Title VII remedies independent of other federal statutory remedies).

■ TAES also argues that the EEOC invalidly issued plaintiff his right–to–sue letter on February 21, 1975, because 180 days had not elapsed since the filing of plaintiff's amended EEOC charge against TAES on September 26, 1974. TAES is correct that receipt of a valid right–to–sue letter from the EEOC is a jurisdictional prerequisite to suit under Title VII. 42 U.S.C. § 2000e–5(f)(1). *Green v. Forney Engineering Co.,* 589 F.2d 243, 246 (5th Cir. 1979). However, TAES is incorrect in asserting that the EEOC must await the passage of 180 days after a charge is filed before issuing a right–to–sue letter. Indeed, the express terms of Title VII indicate that a plaintiff may be entitled to receive a right–to–sue letter "within one hundred and eighty days from the filing" of his EEOC charge. 42 U.S.C. § 2000e–5(f)(1). TAES's argument must be dismissed as unpersuasive, then, because it is based on an incorrect legal assumption.[12] *See Bryant v. California Brewers Association,* 585 F.2d 421, 425 (9th Cir. 1978), *vacated on other grounds,* 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980); *Milner v. National School of Health Technology,* 409 F.Supp. 1389, 1392 (E.D.Pa.1976) (Lord, C. J.) ("The statute does not require a minimum of 180 days for conciliation; rather, it requires issuance of a right–to–sue letter *within* 180 days."). *Cf. Occidental Life Ins. Co. v. EEOC,* 432 U.S. 355, 361, 97 S.Ct. 2447, 2452, 53 L.Ed.2d 402 (1977) ("The 180–day limitation provides only that this private right of action does not arise until 180 days after a charge has been filed."); *Brown v. GSA,* 425 U.S. 820, 832, 96 S.Ct. 1961, 1967, 48 L.Ed.2d 402 (1976) (42 U.S.C. § 2000e–5(f)(1) provides that "the complainant may file a civil action if, after 180 days from the filing of the charge or the appeal, the agency . . . has not taken final action.").

■ Certain of the individual defendants complain that they have not been named in plaintiff's EEOC charge and that they cannot, therefore, be defendants in plaintiff's Title VII claim. However, these defendants have not been sued under Title VII. Hence, in this regard, nothing is presented which should further detain the analysis. Panola County lodges a similar objection. As indicated earlier, Panola County is to be considered a Title VII defendant, even though plaintiff named only the Commissioners Court in his EEOC charge and in this civil action. The fact that the county is treated as a Title VII defendant does not contravene the rule that Title VII defendants must be named in an

---

12. It is true that a plaintiff's right to *demand* a right to sue letter does not arise until 180 days after the filing of an EEOC charge. However, the right to demand a right–to–sue letter is entirely different from the right to receive such a letter.

EEOC charge, in that the county and the Commissioners Court are, for all relevant purposes, the same entity. The county undoubtedly had notice of the administrative and judicial complaints lodged by plaintiff, and it has defended against those complaints. *See Tillman v. City of Boaz*, 548 F.2d 592, 594 (5th Cir. 1977); *Williams v. Southern Bell Telephone & Telegraph Co.*, 464 F.Supp. 367, 370–71 (S.D.Fla.1979); *Stringer v. Commonwealth*, 446 F.Supp. 704, 706 (M.D.Pa.1978).

## III.

### DISPARATE TREATMENT CLAIM

■ In this civil action, subtle analyses of neutral employment practices with supposedly unintended discriminatory effects is not required. Nor is this a case in which intentional discrimination is "inferred from the mere fact of differences in treatment." *Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854, n. 15, 52

L.Ed.2d 396 (1977). Rather, the evidence presents a strong case of overt, deliberate, and intentional discrimination by the defendant employers against Harold Wells.[13] Specifically, plaintiff proved that defendants' decision to pay him less than his white counterparts was substantially motivated by consideration of race; indeed, it is unquestionable that race was the most significant factor in the decision to pay him less than whites doing corresponding work,[14] and that, absent racial considerations, plaintiff would not have been paid less than the analogous whites. Such proof entitles plaintiff to relief. *McDonald v. Santa Fe Trail Transportation*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580, 49 L.Ed.2d 493 (1976) (other rationales for employer action are pretextual if racial factors were "but for" cause of action); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("The forbidden taint need not be the sole basis for the action to warrant relief,

---

**13.** In a typical case involving equal pay, discriminatory discharge, or discriminatory failure to promote, the plaintiff can establish a *prima facie* case by adducing facts from which discrimination can be inferred. Essentially, this is accomplished by proving facts indicating that plaintiff is similarly situated, except for race, with an employee who has been treated more favorably. The employer is then able to rebut this *prima facie* case, if it can articulate a legitimate, nondiscriminatory reason for the difference in employee treatment. If the employer can articulate such a reason, the employee can finally carry his burden of proof by proving that the employer's justification of its action is, in fact, a pretext for racial discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (establishing typical proof process); *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 64 (5th Cir. 1980) (explaining proof process in equal pay for equal work context); *Whiting v. Jackson State University*, 616 F.2d 116, 120–21 (5th Cir. 1980) (setting forth proof process in discriminatory discharge context). This litigation has produced proof of intentional discrimination against Harold Wells, resulting in his receipt of a lower salary. The proof of such discrimination is direct; it involves no inferences of discrimination. Thus, the three-step process outlined in the preceding paragraph collapses into a one–step process. There exists no reason for separating the proof process into three steps. Plaintiff has successfully shown intentional discrimination; any argument by defendants that other reasons motivat-

ed their decisions are by definition pretextual in light of such a finding. *See Williams v. Board of Regents*, 629 F.2d 993, 1001 n. 17 (5th Cir. 1980) ("As a matter of law, appellant had no valid defenses to the firing *if* it was because of the [protected] communication."). The proof in this case involves a direct confrontation between plaintiff's evidence of intentional discrimination and defendants' evidence of legitimate motivation. This is the only step to be considered, and the former has been proved by the overwhelming preponderance of the evidence.

**14.** As the district court noted, . . . appellant has adopted a disparate treatment theory . . . and alleges . . . that she was disfavored . . . because of her sex. While the *McDonnell Douglas* case sets forth one approach to proving discriminatorily disparate treatment . . ., that manner of proof "was not intended to be an inflexible rule." The ultimate issue in a disparate treatment case . . . is whether the prohibited criterion . . . was a *factor* in the challenged employment decision. For example, the issue of sex–based pay inequities simply does not fit under *McDonnell Douglas* analytic framework. The question is rather whether appellant can prove . . . that she was paid less because of her sex than similarly situated males.
*Satz v. ITT Financial Corp.*, 619 F.2d 738, 745–46 (5th Cir. 1980) (citations and footnote omitted).

but it must be a *significant* factor."); *Garcia v. Gloor*, 609 F.2d 156, 160 (5th Cir. 1980) (violation of Title VII if forbidden reason is significant factor in employment decision); *Corley v. Jackson*, 566 F.2d 994, 999–1000 (5th Cir. 1980) (Title VII violated if impermissible factor significant in decision, even if permissible reasons could have justified decision).

■ The facts produced in this lawsuit lead to one fundamental conclusion: defendants maintained in Panola County a segregated system of employment, with a white agent's position and a black agent's position.[15] Job responsibility and pay levels were set accordingly, the white agent being made superior in all respects. This central reality, or basic theme, explains the pay disparity from which Harold Wells suffered for years. This two–tiered structure in Panola County began in the days of "separate–but–equal" intentional segregation, when job assignment and salary were set along racial lines. Defendants do not even deny the illegality of this historic arrangement;[16] and despite their arguments to the contrary, it cannot be said that, while the form of the arrangement changed, the substance did not.

Merger of the white and black services resulted in a demotion for plaintiff and all other black extension agents. Prior to the merger, white agents were county agents and black agents were Negro county agents. These agents performed essentially parallel jobs. Upon merger, the black agents became associate agents, while the white agents remained county agents. This unmistakably indicated that plaintiff and all associate agents occupied a status inferior to the white agents. To further signify the split between the white and black positions, the white agent in Panola County (and all other counties) was given the title of county chairman. Finally, the discriminatory pay existing prior to merger was continued thereafter in Panola County and all other Texas counties.[17] Although job titles and agency organization were changed, the meaning of this structure was apparent to all: an extension agent position in TAES was strictly determined by race.[18]

■ These statistics, which indicate the rigid separation[19] of TAES agents along

---

**15.** Plaintiff's Exhibit No. 24 contains United States Department of Agriculture audit reports which evince determinatively the rigid black position–white position division in counties employing both black and white agricultural extension agents.

**16.** Acts of discrimination occurring more than two years before the filing of an EEOC charge or before the effective date of Title VII, July 2, 1965, may be considered, because they are relevant to questions of (1) intent and (2) the perpetuation of past discrimination by neutral employment practices. *See Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374, 1378 n. 8 (5th Cir. 1978).

**17.** Plaintiff's Exhibit No. 24 contains United States Department of Agriculture audit reports which conclusively evidence that (1) black agents almost always received a lower salary than white agents in the same county, and (2) black agents in the state received lower salaries than similarly situated white agents.

**18.** At the time of the merger of the black and white services, fifty–seven counties in Texas had both black and white agents, but no black agent was appointed county chairman until 1973, despite the fact that these appointments were made each year. At the time of trial, two of 243 county chairmen were black.

After merger, all of the district agents were white. The two black district agents in the former Negro agricultural extension service were transferred to jobs as program specialists. One of the two, Mr. R. A. Sanders, asked why he could not serve as a district agent ·in a unified service. The director, according to Sanders, replied that the time was not right for having a black district agent. In fact, a black district agent was not appointed until September 1, 1976.

**19.** *See Myers v. Gilman Paper Corp.*, 544 F.2d 837, 853 (5th Cir. 1977) ("A substantial disparity between the proportion of blacks and whites assigned to certain job classifications can be sufficient to establish a prima facie case of employment discrimination.").

An audit, conducted in 1966 by the inspectors for the U.S. Department of Agriculture, disclosed that of the ninety–one non–white county office professional employees (forty–eight male and forty–three female), none had been considered for advancement from the position of associate agent to fill vacancies in the positions of County Agricultural Agent and County Home Economics Demonstration

racial lines, plainly indicate the intentional nature of the discrimination.[20] As the Fifth Circuit has noted, "[n]othing is so emphatic as a zero . . . ." *United States v. Hinds County School Board*, 417 F.2d 852, 858 (5th Cir. 1969).[21] Nevertheless, there are six other factors which demonstrate that plaintiff was the victim of intentional racial discrimination. First, black employees of Panola County have always suffered from discrimination.[22] At best only a small handful of black persons have been employed by the county, and these have been employed only in janitorial and unskilled labor capacities. Black county employees have always been lower in salaries and positions than any white county employee. Moreover, social segregation in the county has been blatant and rigid.[23] At the time of the trial of this civil action, clubs, churches, and private associations were totally segregated. It is true that Wells had a higher position than any other black person on the county payroll, but this fact neither neutralizes the discrimination against plaintiff nor diminishes the probative effect of the general segregation in the county.

Second, the evidence indicates that the black female employees of TAES in Panola County, and all Texas counties, found themselves in a situation parallel to the situation of the male employees. TAES hired females to be county home demonstration extension agents only. The history of racial segregation in the home demonstration position is roughly analogous to the history relating to the agricultural extension agent position; that is, provision was made for a white home demonstration agent and a black home demonstration agent. The occupant of the white position received a higher salary and appeared to have a greater responsibility. Moreover, the secretarial staff in each county often had a white and a black position, the white position being authorized more pay than the black position. This systematic segregation of TAES employees into white and black positions clearly indicates the intentional placement of plaintiff into a position whose pay and perquisites were diminished by reason of his race.

Third, Wells' duties were substantially the same as the duties of his white counterparts. Differences between the white position and the black position largely derived from differing titles and

Agent. Vacant positions at the time of the audit were filled by caucasian assistant agricultural agents, who had a minimum of two years of experience in extension work and four years of college credit. At the time of the audit, the average non–white associate agent had 22.1 years of experience in extension work and 4.2 years of college credit. The vacant positions were filled with white Assistant County Home Economics Demonstration Agents or with white women employed initially as County Home Economics Demonstration Agents. The white women filling the vacancies had an average of less than two years experience in extension work, with four years of college credit. The average non–white associate County Home Demonstration Agent had 16.19 years of experience in extension work and had 4.25 hours of college credit. The auditor stated in his report that state office officials attributed this failure to appoint blacks as county agents to the unwillingness or reluctance of county commissioners courts to accept blacks in top positions in the county offices.

20. The usefulness of statistics in employment discrimination cases has often been explained. *See, e. g., Sagers v. Yellow Freight System,*

*Inc.*, 529 F.2d 721 (5th Cir. 1976); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 225 n. 34 (5th Cir. 1974).

21. *See Crawford v. Western Electric Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980) ("Statistical disparity between blacks and whites, especially when coupled with direct evidence of racially motivated conduct or language, might also, in a proper case, satisfy plaintiffs' initial burden.").

22. The existence of gross statistical disparities takes on added significance in light of a history of past intentional discrimination. Considered in that light, the continuance of intentional discrimination can be inferred. *See Furnco Construction Co. v. Waters*, 438 U.S. 567, 580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978) (racial composition of work force is relevant to intent); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 225 (5th Cir. 1974).

23. In 1968, Panola County was one of only two Texas counties which had not integrated its extension offices. Although the black personnel were moved to the county courthouse, they were placed in an office across the hall from offices used by the white extension employees.

paper responsibilities, for actual responsibilities did not vary substantially. Given the substantially similar positions, the salary difference manifested racial discrimination. Insofar as there were actual differences in Wells' job and the job of his white counterparts, the dissimilarities related directly to discrimination in job assignments and promotions. Moreover, the evidence showed that, throughout TAES, black agents with similar qualifications to white agents received substantially less salary. Thus, defendants' arguments that salary differences were justified by differing job qualifications, job responsibilities, and job performance is generally untrue.[24] To the extremely limited extent that these arguments of differing qualifications, responsibilities, and

performance are accurate, they constitute more pretext for overt racial discrimination, being merely *post hoc* justification for intentional discrimination.[25] While certain of these factors may conceivably have justified a salary differential, this does not mean that defendants did, in fact, rely on them in determining the variance in salary.[26]

The evidence disclosed an illuminating example, occurring in 1972, of the intentional discrimination inherent in the maintenance of a black position and a white position. When Gordon Ford was hired in 1972 to replace Alfred Croix, he was given *exactly* the same salary that Croix had received. It seems unlikely that he possessed the exact qualifications of Croix. More-

24. The system utilized by both defendant employers, Panola County and TAES, with regard to promotion and pay decisions was characterized by exactly the type of unbridled subjectivity which furnished a channel for intentional and unintentional racist decision-making by employers. *See Crawford v. Western Electric Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980); *Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374, 1384 85 (5th Cir. 1978). Relevant decisions were made solely by white males without reference to significant written criteria. While employment decisions need not be, and could never be, totally objective, the total absence of any element of objectivity can lead to exactly the type of intentional discrimination practiced by defendants against plaintiff. It appears that TAES has entered into a consent decree which should obviate these concerns. *See* note 51, *infra.*

25. Because an action *could be based* on legitimate grounds does not mean that the action was, in fact, so based. If race was a significant factor in paying one worker less than another, the employer will not be heard to argue that there are legitimate reasons that might have justified that pay differential. The court is obliged to look for the employer's "real motive." *Whiting v. Jackson State University*, 616 F.2d 116, 125 (5th Cir. 1980). The Fifth Circuit has implicitly held that reasons which could justify employer action are no more than mere pretext where the action was actually motivated by racial animus. *Id.* In this civil action, plaintiff has proven not only that race was a significant factor resulting in receipt of a salary lower than his white counterparts, he has shown that he would not have received this lower salary "but for" racial discrimination. *Cf. Mt. Healthy School District Board of Education v. Doyle*, 429 U.S. 274, 285-87, 97 S.Ct. 568, 575 76, 50 L.Ed.2d 471 (1977) (person dis-

charged for impermissible reason entitled to relief only upon showing that action would not have been taken but for reprobated reason). *Accord, Thompson v. Bass*, 616 F.2d 1259, 1267 (5th Cir. 1980); *Whiting v. Jackson State University*, 616 F.2d 116, 122 (5th Cir. 1980); *Williams v. Board of Regents*, 444 F.2d 993, 1001 (5th Cir. 1980); *Kingsville Independent School District v. Cooper*, 611 F.2d 1109, 1113 14 (5th Cir. 1980).

26. Even if actual differences in job responsibilities accounted for salary differences, defendants are, nevertheless, responsible for the institution and maintenance of a dual system of employment, designed to create and perpetuate racial disparities in most aspects of employment. This system is almost a mirror image of the one detailed in *Wade v. Mississippi Cooperative Extension Service*, 372 F.Supp. 126 (N.D. Miss.1974), *aff'd in relevant part*, 528 F.2d 508 (5th Cir. 1976), *on remand*, 424 F.Supp. 1242 (N.D.Miss.1976). As indicated in the text, the pre merger system was illegal. Merger operated to demote black employees and to change the form, but not the fact, of segregation. Parallel employment tracks were established in TAES and in Panola County for white *vis-à-vis* black employees. Separate titles and duties were assigned to rigidly separated employment "slots," depending on color alone as a dividing line. The perpetuation of such a system is plainly unlawful. *See especially id.; James v. Stockham Valves & Fittings Co.*, 559 F.2d 310 (5th Cir. 1977); *Swint v. Pullman-Standard*, 539 F.2d 77 (5th Cir. 1976). *See Hardy v. Porter*, 613 F.2d 112 (5th Cir. 1980); *Caliborne v. Illinois Central Railroad*, 583 F.2d 143 (5th Cir. 1978); *Garner v. Giarrusso*, 571 F.2d 1330 (5th Cir. 1978); *Corley v. Jackson Police Department*, 566 F.2d 994 (5th Cir. 1978); *Gamble v. Birmingham Southern Railroad*, 514 F.2d 678 (5th Cir. 1975).

over, at the time Ford was hired, he had not been named county agent and program leader; his job was thus identical to that of Wells. In sum, this incident is a circumstance to evidence the existence of a white job and a white salary, separate and apart from a black job and black salary, and having nothing to do with personnel evaluations.

Fourth, the failure to promote Wells in 1972 evidences the intentionality of discrimination. On January 15, 1972, white agent Croix resigned from his position. Wells made inquiry of District Agent Lehmberg whether he, Wells, could have the job vacated by Croix. Lehmberg had already asked the members of the Commissioners Court of Panola County if they would consider a black person for the position of county agent. The Commissioners unquestionably knew that he was speaking of Wells; their response was that a black person would not be considered for the position; that the citizens of the county were not ready for such an arrangement. Later, Wells made an outright application to Lehmberg for the job. In reply, Lehmberg candidly stated, in substance, that Wells was a fine agent, but could not be promoted because he was black. The evidence revealed, with little doubt, that Wells was as well qualified for the job as Gordon Ford.[27] Hence, the refusal to promote plaintiff stemmed from unequivocal racial discrimination and perpetuated the segregated employment system in the county.

Fifth, there is disturbing and convincing evidence that Commissioner W. J. "Pig"

Rich, in responding to requests for an increase in the county contribution to the salaries of black TAES employees, referred to plaintiff as a "nigger." When challenged on his word choice, he repeated the racial epithet, insisting that Wells be called a "nigger", because "that's what he is." It is also in evidence that one commissioner told a Panola County citizen that the extension service would be reinstated when Wells was eliminated, saying, in substance, "With the nigger gone and when the uproar dies down we will have an extension agent."

Sixth, it will be explained in the following section that Panola County's decision to terminate its contribution to TAES was taken in retaliation against Wells' complaints of employment discrimination. The response of the Commissioners Court to allegations of discrimination, itself discriminatory, is probative of the Court's intent in making previous employment decisions.[28]

■■■ The members of the Commissioners Court maintains that it should not be held liable for the shortfall in Wells' salary, because they could not know the qualifications, job performance, and responsibilities of extension agents—a rather curious argument, since it conflicts with their contention that these same factors justified the pay differential between the white and black positions. In any event, the county paid out differing amounts of money to white and black agents, and if the members of the Commissioners Court had inadequate knowledge of the relative merits of each employee, then it follows that they based their decision on racial considerations.

27. *See East v. Romine, Inc.*, 518 F.2d 332, 339 (5th Cir. 1975) ("[C]omparative evidence lies at the heart of a rebuttal of a prima facie case of employment discrimination.").

28. The Supreme Court has mentioned four factors which shed light on the intent of a legislative body in taking a particular step. (1) "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). (2) "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's pur-

poses." *Id.* (3) "Departures from normal procedural sequence also might afford evidence that improper purposes are playing a role." *Id.* (4) "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268, 97 S.Ct. at 565. All four of these considerations have been discussed in this part of this memorandum opinion, and as to each factor, it is evident that the decision by the Commissioners Court to terminate county funding of TAES was taken in retaliation for Wells' formal and informal complaints of illegal discrimination.

The members of the Commissioners Court also assert that the county's contribution to the agents' salaries were set in total ignorance; that they relied solely on the recommendation of TAES in this respect. Similarly, the extension service argues that it could not control the level of county contribution. Neither of these arguments is correct. In actuality, both the state and the county are responsible for the varying contributions of the county to the agents' salaries. Although TAES regularly made a formal salary request, which the county always approved, the formal request and approval represented an after–the–fact decisional process. The salary decisions, in reality, arose out of an informal dynamic, consisting of *ad hoc* consultations between TAES supervisors and the Commissioners Court. In these discussions, TAES undertook to determine informally what salary would be approved. In the utilization of this process, both the county and the extension service were active participants in making the determination of the amount of the county's contributions to the agents' salaries. This process also reduced open conflict between the county and TAES; that is, the county was able to discriminate in its salary contributions without objection from TAES, and TAES maintained a smoothly operating relationship with the county by acquiescing in the flagrant discrimination. The actual county contribution, then, was determined by negotiation between the county and the state, both parties considering race as a factor in setting the amount of the county's contribution to agents' salaries. When parties join in such discrimination, both are liable. *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310 (1977); *Myers v. Gilman Paper Co.,* 544 F.2d 837, 848 (5th Cir. 1977); *Sagers v. Yellow Freight System, Inc.,* 529 F.2d 721 (5th Cir. 1976); *Macklin v. Spector Freight Co.,* 478 F.2d 979 (D.C.Cir.1973). The cases make it plain that the members of the Commissioners Court may not validly assert that they merely assented to the feelings of local citizens, and that TAES cannot be permitted to argue that it merely conformed to the judgment of county officials.[29] *Faraca v. Clements,* 506 F.2d 956 (5th Cir. 1975). *See Wade v. Mississippi Cooperative Extension Service,* 372 F.Supp. 126 (N.D.Miss.), *aff'd in part, rev'd in part, and vacated and remanded in part,* 528 F.2d 508 (5th Cir.), *on remand,* 424 F.Supp. 1242 (N.D.Miss.1976).

The county similarly contends that it should not be liable for the disparity in salary between Wells and his white counterparts, because the members of the Commissioners Court were never made aware of the total salary received by any agent. Whether or not the county's governing body knew the agents' total salaries, they assuredly knew of the county's contribution to those salaries. The intentional discrimination evidenced by the differing contribution to the respective salaries paid to the black and white agents is, in itself, unlawful. Beyond what has been said, the county could have requested information about total salaries in which it was interested, and TAES would have provided such information. The county never attempted to determine the total salaries of the Panola County extension agents, and, in the final analysis, this indifference is no better than the actual discrimination in which the county is found to have engaged.

Further, the county's contribution to the agents' salaries is not the only reason for the deficiency between Wells' salary and those of his white counterparts. A state and federal component is present in every agent's salary. TAES is responsible for designating the particular share of state and federal funds included in each agent's salary. In most of the years of Wells' employment, the total of the state and federal portions of his salary was lower than the aggregate for the white agents. TAES had control over the whole amount of these two

---

**29.** Plaintiff's Exhibit No. 24 contains United States Department of Agriculture audit reports which shows beyond peradventure of a doubt the extent to which TAES acquiesced to county racial prejudice, by refusing to appoint black personnel to be county agents, county chairmen, or program leaders.

constituents and thus had the power to equalize the salaries of its agents. Indeed, by generally adjusting the state's portion of the black agents' salaries, TAES could have ended the federal, county, and state disparities in Wells' particular salary. No doubt, TAES was slowly moving in this direction; nevertheless, it had never ceased to pay Wells at a lower salary level than his white counterparts, merely because Wells was black.

The members of the Commissioners Court of Panola County also assert that they are not guilty of discrimination, because salary increases for Wells and his white analogues were based on the application of an equal percentage to the salary each agent had been receiving between 1968 and 1964. However, because salaries had already been established at discriminatory levels, this percentage increase exacerbated the existing salary disparities. Moreover, each increase was itself discriminatory, inasmuch as the white agent always received more than Wells. Hence, the Commissioners Court cannot avoid responsibility for unequal salary contributions by pointing to such a percentage increase, especially where, as here, each increase worsened an existing inequality.

It is further argued by the members of the Commissioners Court that they could not increase Wells' salary without increasing the salary of all county employees, reasoning that an increase in the salary of only one employee might agitate other county employees. Racial discrimination cannot be justified because its abolition might roil other employees. Wells' salary having been set illegally low because he was black, the illegality cannot be expiated by reference to general employee attitudes. Similarly, the argument of the Commissioners Court that Wells made more than most county employees cannot be accepted as valid, since this alleged state of facts, even if true, does not in any respect diminish the Commissioners Court's discrimination between Wells and the parallel whites.

Finally, the members of the Commissioners Court maintain that the county could not afford an increase in Wells' salary. This "lack of funds" hypothesis cannot be approved. The evidence revealed rising assessments and revenues in Panola County. Panola County had operated in the black, and was so operating in 1974. The county manifestly did not lack the funds with which to pay Harold Wells or any other employee whose salary was set too low on account of race. The Commissioners Court also argues that the equalization request from TAES came in mid–year, preventing any action upon it. This contention is likewise invalid. First, the Commissioners Court was not obliged to wait for a request to cease discrimination; its members could not discriminate with impunity until requested to stop the discrimination. Second, the Commissioners Court could have transferred funds from different accounts in order to accomplish an increase in Wells' salary. Third, the Commissioners Court did not choose to equalize the county contributions to agents' salaries in 1975; instead, it terminated all funding of TAES operation in Panola County, which calls into question all that went on before.[30]

## IV.

### RETALIATION CLAIM

Title VII's provisions plainly make it illegal to discriminate against an employee who opposes an unlawful employment practice. *Rosser v. Laborers' International Union of North America, Local Number 438*, 616 F.2d 221, 223 (5th Cir. 1980).

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

---

**30.** *See Howard v. Haverty Furniture Companies, Inc.*, 615 F.2d 203, 205 (5th Cir. 1980) (Where there is evidence of discriminatory intent, "the courts have correctly discounted testimony that actions were committed for other reasons.").

42 U.S.C. § 2000e–3(a). Plaintiff has established by the clear preponderance of the evidence that TAES and Panola County violated this provision of Title VII, discharging him in retaliation for his assertion of his constitutional and statutory rights to be freed from employment discrimination. *See Jeffries v. Harris County Community Action Association,* 615 F.2d 1025 (5th Cir. 1980).

Initially, it is necessary to identify the protected activity in which plaintiff engaged and for which he suffered discharge. In essence, plaintiff suffered retaliation for having filed a charge with the EEOC. However, to understand the dynamic which developed after the EEOC charge was filed, it is useful to recall the historical context of Wells' complaints. As early as 1965 or 1966, Wells aired his grievance to the Commissioners Court concerning the difference between his salary and the higher salary of Alfred Croix, the white agent. In December 1971, Wells again mentioned to Lehmberg, the TAES district agent, the dissatisfaction he felt regarding his discriminatory pay and job assignments. On January 10, 1972, Lehmberg communicated Wells' discontent to the Commissioners Court. At that time, Lehmberg was told that Panola County was not prepared for a black county agent, and that there would be no equalization of the salaries of the two agents. Immediately after Croix's resignation from TAES on January 15, 1972, Wells discussed with Lehmberg a promotion to the county agent position vacated by Croix. Lehmberg refused Wells this promotion, on the ground that the Commissioners Court of Panola County was not ready for it.

At this juncture, because he was not even considered as a candidate to fill Croix's vacated position, Wells considered filing suit against the county. Lehmberg thereupon suggested to Wells the inadvisability of this course, rationalizing that Wells would thereafter have trouble with TAES, the Commissioners Court, and the producers served by TAES in Panola County. Wells decided not to file a lawsuit at that time, early in 1972, because, first Lehmberg assured him that the Commissioners Court would be approached again by TAES regarding the discriminatory pay levels and job assignments, and, secondly, he had difficulty finding a lawyer to represent him in his civil rights case.

On February 2, 1972, Lehmberg and Wells confronted the Commissioners Court regarding the salary disparities of the white and black agents working in the county, Lehmberg requesting the Court to equalize the agents' salaries. Again, the Commissioners Court expressed no desire to accommodate this request, and Commissioner Rich, in referring to Wells, called him a "nigger." Lehmberg reported the court's response to his superior in TAES, Joe Roethe, by way of a letter.

It was only after Ford had been chosen county agent, county chairman, and county program leader, and after the Commissioners Court had refused to equalize the agents' salaries, that Wells decided to file a charge with the Equal Employment Opportunity Commission. The charge was filed on December 3, 1973. Within half a year, the county had decided to terminate its contribution to TAES' operations in Panola County. Throughout that period, Wells' EEOC charge was a controversial and highly visible issue in the county. On December 5, 1973, two days after the filing of the charge, Commissioner Brooks contacted Gordon Ford, the white agent, regarding Wells' charge. Brooks stated that he was concerned about the charge. The next day, Thursday, December 6, 1973, Ford called Lehmberg to tell the latter of Brooks' concern. Lehmberg told Ford to call County Judge Bailey and request that the Commissioners Court meet to consider the problem presented by Wells' complaints and EEOC charge. The Commissioners Court met with Lehmberg on the following day. At the meeting, Judge Bailey indicated that the members of the Commissioners Court were extremely upset abut the EEOC charge and that they were considering three alternatives: (1) doing away with all extension activity in Panola County; (2) abolishing Wells' job; or (3) taking no action.

The circumstances strongly suggest that, at some time before September 10, 1974, the Commissioners Court reached an informal decision to terminate county contributions to TAES. This decision was not taken in an open vote or in an open meeting whose agenda had been announced;[31] rather, the Commissioners privately decided among themselves to delete the county contribution. After the decision, the Commissioners Court held a meeting on September 10, 1974, which was attended by citizens who were irate about the termination of TAES. At this meeting, a citizen and former newspaper editor stated a concern that termination of county funding of TAES might result in a loss of federal revenue sharing funds. Commissioner Rich replied that if the federal government held revenue sharing funds over their heads in that way, he would prefer to see the money sent to Rus-

sia. After this meeting, one Commissioner told a concerned citizen that TAES would be reinstated in Panola County after the EEOC charge affair blew over. As already mentioned, another Commissioner told a citizen: "With the nigger gone and when the uproar dies down we will have an extension agent."

All of this evidence is probative of the county's retaliation against Wells. The termination decision was made a half-year after the EEOC charge. Many statements indicate the motivation of the Commissioners Court in ending the extension service. The manner in which the Commissioners Court actually made the decision to discontinue TAES indicates an element of deviousness and conscious guilt. It is also significant that the budget from which the

---

**31.** The following notice was posted on August 8, 1974, in the Panola County Courthouse in Carthage, Texas.

TO WHOM IT MAY CONCERN:

Notice is hereby given that a public meeting will be held by the Commissioners' Court of Panola County, Texas on the 12th day of August, 1974, in the Commissioners' Courtroom of the Panola County Courthouse in Carthage, Texas, at 9:00 a. m. in which meeting the following subjects will be discussed and the following matters acted upon:

1. Discussion of salaries for 2 Dispatchers and Secretaries;
2. Employment of Ennis McFadden, Jr., as Deputy Sheriff to replace Joe Hull;
3. Whether Panola County continues agreement for Partition by Panola County in the Child Welfare Program;
4. Payment of bills;
5. Setting Budget Hearing (Art. 679–11 & *Gronis v. Duval Co.* 337 Sec.2d 306;
6. Appointment of County Health Officer;
7. Authorizing the construction of boat ramps, tables and toilets in Panola County Toledo Bend Park and advertising for bids.

THIS NOTICE IS GIVEN PURSUANT TO ARTICLE 6252–17 REVISED CIVIL STATUTES OF TEXAS, AS AMENDED.

On August 12, 1974, the following notice was posted on the bulletin board of the Panola County Courthouse in Carthage, Texas.

TO WHOM IT MAY CONCERN:

Notice is hereby given that a public meeting will be held by the Commissioners Court of Panola County, Texas, on the 14th day of August, 1974, in the Commissioners' Courtroom in the Panola County Courthouse in Carthage, Texas, at 8:00 a. m. at which meet-

ing the following subjects will be discussed and the following matters acted upon:

Setting Budget Hearing

(Discussing Budget with all County Officials)

THIS NOTICE IS GIVEN PURSUANT TO ARTICLE 6252–17 REVISED CIVIL STATUTES OF TEXAS, AS AMENDED.

On August 29, 1974, a notice was posted on the bulletin board in the Courthouse of Carthage, Texas, which read as follows:

TO WHOM IT MAY CONCERN:

Notice is hereby given that a public meeting will be held by the Commissioners' Court of Panola County, Texas, on the 3rd day of September, 1974, in the Commissioners' Courtroom in the Panola County Courthouse in Carthage, Texas, at 9:00 A.M. at which meeting the following subjects will be discussed and the following matters acted upon:

1. Payment of Archtect's [sic] fees–drawing phase of Courthouse improvements, $1500.00;
2. Resignation of Hughleen Patrick as Alternate Judge for Absentee Voting Box; Appointment of successor;
3. Confirmation of and fixing a public hearing on the Panola County Budget for 1974–1975, to be had on the 10th day of September, 1974, at 9:00 o'clock A.M. in the County Courtroom;
4. Opening of bids on Boat ramps and park facilities on Panola County Toledo Bend Park (known as Yellow Dog);
5. Payment of bills;
6. Increasing Juror's pay from $5.00 to $10.00 per day.

THIS NOTICE IS GIVEN PURSUANT TO ARTICLE 6252–17 REVISED CIVIL STATUTES OF TEXAS, AS AMENDED.

extension service was eliminated contained a proposed county contribution to agents' salaries that would have been equal for white and black agents. When cumulated, this evidence belies the county's claim that TAES was terminated in Panola County because it was no longer serving a useful purpose there, and that it was not worth the money. Moreover, the preponderance of the evidence at trial indicated that TAES served an important, almost vital, purpose in Panola County.

■ The Commissioners Court cannot successfully avoid liability for this naked retaliation because all TAES employees, white and black, lost their jobs in Panola County. The decision of the Commissioners Court to terminate extension funding was taken by its members, in an effort to punish TAES, as well as plaintiff, for presuming to suggest that the county obey federal constitutional and statutory law. It is of no moment that Wells was not the only person to suffer as a consequence of having engaged in protected activity. An employer cannot be heard to argue that all employees, white or black, are subject to discharge when they assert the right to be free of illegal discrimination. *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (black employee may be fired for illegal activity if white employees are treated similarly). Moreover, this is not a case in which black and white employees have been treated similarly for engaging in a particular behavior. Wells was the only employee complaining; the white employees who were forced to leave the county suffered for Wells' act— not for an act of their own.[32]

The difficult question arises as to whether TAES should be jointly liable with the county, when the evidence so clearly establishes that it was a legislative decision of the county's government body which terminated extension service operations in Panola County. The troublesomeness of this issue is magnified by three other factors: (1) TAES finally requested the county to raise Wells' salary; (2) it fought termination of county funding; (3) TAES truly desired to serve Panola County and did not wish to cease operations there. Despite these complications, the question must be answered in the affirmative.

■ Shortly after the county discontinued contributions to TAES, the latter terminated Wells' employment. TAES gave Wells the option of working in another county for the agency or resigning. Having been "run out" of Panola County for impermissible reasons relating to race, Wells was under no obligation to work in another county; he maintained this position to TAES. The subsequent action of TAES in discharging Wells was, therefore, essentially in retaliation for having asserted his right to work free of employment discrimination.

■ The events occurring at the time of Wells' dismissal cannot be adequately comprehended unless consideration is also given to Wells' past employment history. Wells had been the victim of intentional racial discrimination since the first moment of his employment with TAES, most of the discrimination having come from TAES and Panola County. Both of these parties actively furthered a system in which discrimination was the activating

---

**32.** Although plaintiff has suggested that this may be an instance of constructive discharge, this does not appear to be the case, because he was dismissed. Constructive discharge concerns situations in which an employee is compelled to resign by reason of intolerable working conditions. In this civil action, plaintiff continued to assert his right to employment in Panola County without being subjected to discrimination. He was only removed from his employment after this consistent refusal to succumb to institutional pressures requiring toleration of the discrimination which he suffered.

*See Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 64–66 (5th Cir. 1980); *Miller v. Texas State Board of Barber Examiners*, 615 F.2d 650 (5th Cir. 1980); *Young v. Southwestern Savings & Loan*, 509 F.2d 140, 144 (5th Cir. 1975) ("The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it has formally discharged the aggrieved employee.").

principle, since there were black jobs, and these jobs paid less than corresponding white jobs. The faint effort TAES made to persuade the county to change this pattern was a case of too little, too late. It was the action of both parties that put Wells in the untenable position in which he found himself in the years 1973, 1974 and 1975; and TAES cannot hide behind the decision of the Commissioners Court to terminate extension funding in Panola County any more than the county can rely upon TAES' decision to fire Wells altogether as a justification for its actions. These decisions and the past pattern of intentional discrimination are inextricably bound together. Consequently, Wells' right to recovery against the defendants for the results of these decisions is likewise infixed.[33]

## V.

## SECTION 1981 CAUSE OF ACTION

[35, 36] Plaintiff has named five defendants in his section 1981[34] cause of action

**33.** It is also important to note that TAES ceased operation in Panola County voluntarily; it was not forced by law to terminate extension activity in Panola County, merely because Panola County failed to contribute to the program. The federal legislation providing for partial federal funding of cooperative state extension programs does not require, or even hint at a requirement of, county financial participation in extension activity within a county. *See* 7 U.S.C. § 341. Nor does any Texas statute require TAES to receive county financial contributions to extension activity as a condition precedent to TAES operation in the county. The resolution passed by the Texas legislature in 1915 creating TAES provides only that Texas A&M College should receive the federal money specified in the Smith–Lever Act and "authorize and conduct agricultural extension work . . . in connection with the A. and M. College of Texas in accordance with the terms and conditions expressed in the [Smith–Lever] Act of Congress." House Concurrent Resolution No. 2, January 22, 1915. This resolution does not mandate county funding of TAES activity. General reference is made to the federal legislation, but that does not require county financial participation. Article 164 of the Revised Civil Statutes of Texas enable county commissioners courts

> to establish and conduct co–operative demonstration work in agriculture and home economics in co–operation with the Agricultural and Mechanical College of Texas, upon such terms and conditions as may be agreed upon by the Commissioners' Court and the agents of the Agricultural and Mechanical College of Texas; and may employ such means, and may appropriate and spend such sums of money as may be necessary to effectively establish and carry on such demonstration work in Agriculture and Home Economics in their respective counties.

This statute plainly does not deprive TAES of the right to operate in a county which officially rejects it. It does no more than authorize the county to fund extension work; the statute does not mandate that funding.

Although Texas A&M University and TAES may not be required to receive county financial contributions as a condition precedent to operation in a county, it does not follow that they cannot require such contribution. The Smith–Lever Act provides that the federal money appropriated to extension work shall be administered by the college which the state legislature selects. 7 U.S.C. § 341. The concurrent resolution quoted above directs Texas A&M College (now Texas A&M University) to receive federal and state money designated for extension work and to conduct such work. Finally, Tex.Rev. Civ.Stat.Ann. art. 164, which authorizes county contributions to extension activity, seems to indicate that TAES may require county contribution to extension work. It is concluded that TAES may require county financial contribution to extension work in a particular county.

The result of this analysis indicates that TAES withdrew voluntarily from Panola County. Although such voluntary withdrawal may be legitimate in a situation in which the only issue is whether a county will contribute to the extension program, it is unlawful if the withdrawal represents voluntary acquiescence in discrimination. The rule requiring county fiscal participation in extension activity may be wise in general, and TAES may legitimately rely on it in the ordinary execution of its extension program. When a county simply refuses to fund TAES activity in the county for lawful reasons, TAES's voluntary withdrawal from the county is also lawful and made for valid business reasons. But Panola County's decision to terminate funding of TAES activity in Panola County was plainly unlawful, and TAES's acquiescence in that decision was also unlawful. It cannot seek refuge behind its own rule requiring a county contribution, where the invocation of that rule constitutes acquiescence in an unlawful employment decision.

**34.** 42 U.S.C. § 1981 provides:
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of per-

tion: (1) Panola County, (2) the Commissioners Court of Panola County, (3) TAES, (4) TAES Director John Hutchinson, and (5) the individual Commissioners and the County Judge, who constitute the membership of the Commissioners Court of Panola County. "When section 1981 is used as a parallel basis for relief with section 706 of Title VII against disparate treatment in employment, its elements appear to be identical to those of section 706." *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980).[35] In the preceding section, TAES and Panola County were found to have violated this provision of Title VII. Consequently, these two entities are also in violation of 42 U.S.C. § 1981. The County Judge, the Commissioners, and the Commissioners Court are absolutely immune in a lawsuit brought under Section 1981 that brings into issue actions which they have taken in a legislative capacity. All actions taken by these defendants which are relevant to this cause of action were taken in such a capacity. *See Supreme Court v. Consumers Unions*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979).

John Hutchinson was Director of TAES during all the years of Wells'

employment with TAES, although he is no longer the Director. As Director, Hutchinson was amenable for official agency policy, since he was the person primarily responsible for changes in agency structure during the years that Wells was employed. Title changes, merger of the two services, institution of the county chairman position—all these alterations were directly conceived and implemented by Hutchinson. Given his position and the reality of its exercise, all of the foregoing analysis applicable to TAES' responsibility for employment discrimination is also applicable to the Section 1981 cause of action against Hutchinson in his official capacity. Moreover, Hutchinson must be held responsible in his individual capacity, for the actions he took which furthered the employment discrimination damaging Harold Wells.[36] *Cf., Wood v. Strickland*, 420 U.S. 308, 321–322, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975). The state of the law was clear during much of Wells' tenure that one person should not, on account of race,[37] receive a lower salary than another person occupying a similar position in a state agency. It was also clear that a state agency should not be operated in such a manner that black employees performing work corresponding to that of white employees would perforce be assigned to a lower ranking official position. Hutch-

sons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**35.** Defendants apparently argue that plaintiff's causes of action pursuant to 42 U.S.C. §§ 1981 and 1983 are barred by the applicable statute of limitations. The applicable limitations period for causes of action pursuant to these statutes is two years in Texas. *Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1255 (5th Cir. 1979) (Section 1981 cause of action); *Snell v. Short*, 544 F.2d 1289, 1290 & n. 2 (5th Cir. 1977) (Section 1983 cause of action). *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). In light of the foregoing determination that plaintiff has satisfied the 180–day requirement of Title VII, this argument that a two year statute of limitations bars suit fails *a fortiori*.

**36.** An official in Hutchinson's position is personally liable in a damage action under 42 U.S.C. § 1983 for actions taken in the discharge

of official responsibilities, if (1) he knew or should have known that the action taken would violate the constitutional rights of the individual affected or (2) he took the action with the intention of depriving another of a constitutional right or causing injury to another. *Familias Unidas v. Briscoe*, 619 F.2d 391, 403 (5th Cir. 1980). *See Douthit v. Jones*, 619 F.2d 527, 532–33 (5th Cir. 1980). *See generally Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheur v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Bogard v. Cook*, 586 F.2d 399 (5th Cir. 1978). *See also Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Of course, plaintiff does not seek damages.

**37.** Plaintiff's Exhibit No. 24 contains United States Department of Agriculture audit reports which convincingly demonstrate that Dr. Hutchinson had notice and knowledge of the illegal employment situation existing in TAES.

inson thus could not have acted in the honest and reasonable belief that TAES policies were lawful. While Hutchinson justified his actions and those of the agency he ran by arguing that Texas citizens were not prepared to cope with civil rights laws, this excuse is both lame and unavailing.

## VI.

## SECTION 1983 CAUSE OF ACTION

■ In his Section 1983 [38] cause of action, plaintiff sues all of the defendants except TAES who are named in his claim based on Section 1981. "Section 1983 serves as a basis for relief for violations of federal law under color of state law. Insofar as it is used as a parallel remedy for transgression of section 1981 and section 706 Title VII rights, the elements of the causes of action do not differ . . . ." *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980). Therefore, the preceding Section 1981 analysis is adopted here. Those defendants liable under Section 1981 are also liable under Section 1983, except for TAES.

## VII.

## TEXAS OPEN MEETINGS LAW

■ Plaintiff asserts that the decision of the Panola County Commissioners Court to discontinue county funding of TAES operations in Panola County was taken in contravention of a state statute forbidding closed meetings. Because this state claim implicates facts identical to those involved in his federal claims, this court has subject matter jurisdiction to decide it, as a pendente claim. Indeed, the state and federal claims are such that a court would ordinari-

ly be expected to try them in one proceeding. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Jones v. Diamond*, 594 F.2d 997, 1011 (5th Cir. 1979); *Miller v. Carson*, 563 F.2d 757, 760–62 (5th Cir. 1977). *See generally Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

Texas law requires the Commissioners Court of Panola County to make decisions only in open meetings. Further, the statutes mandate that the public be given adequate prior notice of the agenda of the meeting. Tex.Rev.Civ.Code Ann. art. 6252–17 provides that a quorum of the members of a county commissioners court shall not meet to discuss public business or make decisions concerning public business, unless the meeting is open to the public and proper statutory notice of the meeting has been given.

■ Here, the preponderance of the evidence showed that the Commissioners Court of Panola County met and decided informally to discontinue TAES funding. The proposed 1975 county budget contained a section indicating the amount of the county contribution to TAES. At some point, a marginal notation was made on the budget indicating that the expenditures for TAES should be eliminated from the budget. It read as follows: "Delate [sic] as per Court 14 August, 1974." It is true that a Commissioners Court meeting was held on August 14, 1974, but the evidence preponderates that TAES funding was never mentioned at the meeting. It is unquestioned that no notice was given that the topic of TAES funding would be considered.[39] Likewise,

---

**38.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**39.** The minutes of the September 10, 1974, meeting, as filed with the County Clerk's office on September 20, 1974, reflect the following:

THE STATE OF TEXAS:
COUNTY OF PANOLA:

On this the 10th day of September A.D. 1974, the Commissioners' Court of Panola County, Texas, met in a Special Session of the Court, at which time the following members were present to–wit:

| | |
|---|---|
| Davis Bailey | County Judge |
| Raybon Ford | Commissioner, Pct. #1 |
| John Brooks | Commissioner, Pct. #2 |
| W. J. Rich | Commissioner, Pct. #3 |
| Roland Davis | Commissioner, Pct. #4 |

with none absent, constituting a quorum of the Court, at which time the following proceedings were had:

the minutes of the meeting do not reflect that the topic was considered. Presumably, any mistake in the minutes would have been corrected at the next court meeting, since this was the normal process. The defendant County Commissioners are the only persons who can recollect that a vote was taken at the August 14, 1974, meeting. In light of the evidence mentioned above, their testimony in this respect lacks credibility.

It is especially noteworthy that the Commissioners never mentioned that TAES funding had ended at the September 10, 1974, meeting of the Commissioners Court, which included a very vociferous discussion of the issue. At the meeting, the Commissioners treated the point in question as though it were not completely decided. They did not indicate, and the citizens present at the meeting did not know, that any action with reference to the topic had been taken. This bolsters the conclusion that no decision was made at the August 14th meeting. In any event, it is clear that the decision was made informally and, therefore, improperly.

■ Because the decision to terminate Panola County contribution to extension activity in the county was reached by the Commissioners in private without adequate notice, the termination decision is voidable. Tex.Rev.Civ.Code Ann. art. 6252–17. *See Lower Colorado River Authority v. City of San Marcos,* 523 S.W.2d 641, 646 (Tex.1975) ("[A] violation of the open meeting law subjects the action taken to judicial invalidation."). Given the egregious nature of the violation in this action, the Commissioners Court's action to terminate TAES funding must be voided.

Motion was made by Commissioner Rich, duly seconded by Commissioner Davis, and unanimously adopted by the Court, that the County Budget for 1975 be approved in accordance with a copy of the Budget on file in the County Clerk's Office. The total County Valuation is estimated to be $60,000,000.00 and the Tax Rate is set at $1.05 per $100.00 Assessed Valuation, with an additional 20¢ on each $100.00 Valuation for Farm to Market Roads and 10¢ on each $100.00 valuation for Farm to Market & Lateral Road Right of Way. The Tax rates by funds are as follows:

| | |
|---|---|
| Jury Fund | .02 |
| Road and Bridge | .13 |
| Road & Bridge Special | .15 |
| General Permanent Improvement Interest and Sinking | .10 |
| Road & Bridge Int. & Sinking | .10 |
| | $1.05 Total Tax Rate |

| | |
|---|---|
| F.M. & LAT | .20 |
| R.O.W. | .10 |
| | .30 |

There being no further business to come before the Court at this time, the meeting was adjourned.

Dated this the 10th day of September A.D. 1974.

The minutes of the meeting of August 14, 1974, reflect the following:

The State of Texas: County of Panola:

On this the 14th day of August A.D. 1974, the Commissioners' Court of Panola County, Texas, met in a Special Session of the Court, at which time the following members of the Court were present to—wit:

| | |
|---|---|
| Davis Bailey | County Judge |
| Raybon Ford | Commissioner, Pct. #1 |
| John Brooks | Commissioner, Pct. #2 |
| W. J. Rich | Commissioner, Pct. #3 |
| Roland Davis | Commissioner, Pct. #4 |

with none absent, constituting a quorum of the Court, at which time the following proceedings were had:

The County Budget was discussed with all county officials. After such discussion, it was duly moved by Commissioner Rich seconded by Commissioner Brooks, and unanimously adopted by the Court that the hearing on the County Budget be set for Wednesday, September 4, 1974 at 9:00 o'clock A.M., and the County Judge is hereby authorized and directed to give proper notice of such hearing.

There being no further business to come before the Court at this time, the meeting was adjourned.

Dated this 14th day of August, A.D. 1974.
Signed by Davis Bailey
Davis Bailey, County Judge
Panola County, Texas

## VIII.[40]

## RELIEF

### Declaratory Relief

Plaintiff is entitled to a declaration that defendants Panola County and TAES violated Title VII, Section 1981, and Section 1983: (1) by discriminating against him, on account of his race, in setting his salary level; and, (2) by discharging him in retaliation for his assertion of his right to be free of employment discrimination. Plaintiff is also entitled to a declaration that defendant Hutchinson violated Sections 1981 and 1983 for the same reasons.

### Back Pay

■ Plaintiff merits an award of back pay, unless special circumstances indicate that such an award would be unjust. *Marks v. Prattco, Inc.*, 607 F.2d 1153, 1155 (5th Cir. 1979). *See generally Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (discussing extensively the right to, and necessity of back pay award). No such conditions exist in this instance.[41] In fact, plaintiff is exceptionally deserving of a back pay award, because of the gross discrimination exercised against him. Plaintiff's back pay award cannot be prevented simply by reason of the fact that the funds with which it might be paid will come from state or county sources. *See Fitzpatrick v. Bitzer,* 427 U.S. 445, 446, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976); *Moore v. Tangipahoa Parish School Board,* 594 F.2d 489, 493 (5th Cir. 1979).

■ Any back pay pursuant to Section 1981 and 1983 is barred beyond the statutory limitations period. In Texas, a two years limitation applies. *Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1255 (5th Cir. 1979) (Section 1981); *Snell v. Short,* 544 F.2d 1289, 1290 & n.2d (5th Cir. 1977) (Section 1983). *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). *See also Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). Under Title VII, back pay may be awarded for a two–year period preceding the Title VII charge filed with the EEOC. 42 U.S.C. § 2000e–5(g) ("Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission."). Because plaintiff's Section 1981 and Section 1983 complaint was filed on

---

**40.** Preliminary to consideration of remedies, certain questions of immunity should be considered in general. First, there is the question of eleventh amendment immunity. Neither defendant Hutchinson in his individual capacity nor Panola County can benefit from such an immunity. *See Familias Unidas v. Briscoe,* 619 F.2d 391, 404 n. 13 (5th Cir. 1980) (local governments do not enjoy eleventh amendment immunity). TAES and defendant Hutchinson, in his official capacity, can benefit from eleventh amendment immunity, but no relief is requested or granted which calls this immunity into play. The equitable remedies of back pay and injunctive relief do not, in this civil action, require the type of state expenditure which the eleventh amendment forbids. Moreover, attorney's fees can be awarded against the state, the eleventh amendment notwithstanding. Second, there is the question of good faith immunity to suit under Sections 1981 and 1983. No governmental entity can avail itself of a good faith defense. *Owen v. City of Independence, Missouri,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Similarly, this good faith immunity cannot apply to an official sued in his official, rather than individual, capacity. *Familias Unidas v. Briscoe,* 619 F.2d 391, 403 n. 12

(5th Cir. 1980). Defendant Hutchinson is the only defendant sued in his individual capacity. However, no cause of action for damages is asserted against him; hence, he has no occasion to avail himself of this immunity. It is true that he can be individually liable for attorney's fees only upon a showing of bad faith, but no request for attorney's fees against Hutchinson is made. In sum, neither good faith nor eleventh amendment immunity affects the relief requested or granted in this civil action.

**41.** "The *Abemarle* presumption in favor of retroactive liability [for back pay] can seldom be overcome, but it does not make meaningless the district courts' duty to determine that such relief is appropriate." *Los Angeles Department of Water & Power v. Manhart,* 435 U.S. 702, 719, 98 S.Ct. 1370, 1381, 55 L.Ed.2d 657 (1978). In *Manhart,* the award of retroactive relief would have bankrupted an employee fund; accordingly, the Court determined that equitable considerations prevented the awarding of such relief. *Id.* at 719–23, 98 S.Ct. at 1380–83. No such equitable considerations prevent the award of back pay in this civil action.

December 26, 1974, and his Title VII charge was filed on December 3, 1973, the Title VII period extends further into history and will be used for computation purposes.

■ It could be argued that Wells' reluctance to assume a position with TAES in another county after leaving Panola County should limit his back pay award.[42] Certainly, traditional mitigation principles apply. To this end, the evidence disclosed that plaintiff had secured employment after his discharge from TAES. This job appears to be a responsible job taken in good faith; and it adequately serves to mitigate damages. Plaintiff had no obligation to accept employment with TAES in another Texas county. Rather, he had every right to demand from defendants his rightful place in Panola County, free of discrimination. The offer of employment in other counties would, if accepted, have inconvenienced plaintiff. Most important, a TAES job in another county would not have vitiated defendants' liability for having discriminated against him in Panola County. *See Claiborne v. Illinois Central Railroad*, 583 F.2d 143, 153 (5th Cir. 1978) ("Failure to accept an offer of reinstatement in a Title VII case does not necessarily terminate the right to relief, so long as those amounts earned elsewhere or earnable with reasonable diligence are deducted from each plaintiff's award.").[43]

■ There are two periods which are relevant for purposes of computing back pay: (1) December 3, 1973, through December 31, 1974 (termination of TAES in Panola County), and (2) January 1, 1975, through reinstatement. During the first period, TAES, Hutchinson, and Panola County are liable for the disparity in the county contribution to Wells' salary, as compared with that of his white counterparts. As indicated earlier, these defendants' complicity is joint. So, likewise, is their liability.[44] As to the shortfall in the remainder of Wells' salary, as compared with the corresponding whites, only Hutchinson and TAES are liable. The County could not control this portion of Wells' salary and hence should not be liable for the illegal deficiency. It follows that Hutchinson and TAES are responsible for the amount of disparity between Wells' salary and that of Wells' white counterparts, after the county's deficiency is taken into account.

■ For the second period (beginning January 1, 1975, after Wells and TAES left Panola County), TAES, Hutchinson, and Panola County are jointly liable for the difference between (1) the salary Wells should have earned absent discrimination as a county agent in Panola County and (2) whatever salary Wells did earn while employed in some other capacity. Thus, TAES, Hutchinson, and Panola County are liable for the difference between Wells' salary as an agent–at–large and the salary that his white counterpart had received as county agent in Panola County. These same defendants are also jointly liable for the salary Wells would have received as county agent in Panola County absent discrimination and the salary he may have earned from other employers after TAES discharged him. This liability extends until the discrimination practiced against Wells is rectified. Since Wells' reinstatement is here adjudged, it is only just that back pay should extend until the reinstatement becomes effective. An award of back pay

---

42. It should be noted that Wells had, in 1972, declined a promotion and the attendant transfer to Beaumont, Texas, where he would have enjoyed an annual salary increase of $1,200 per year.

43. Cf. *Marks v. Prattco, Inc.*, 607 F.2d 1153, 1155 (5th Cir. 1979) ("Appellant has cited us to no authority in this Circuit to support its position that an award of back pay is improper unless reinstatement was sought by the discharged employees."); *Moore v. Tangipahoa Parish School Board*, 594 F.2d 489, 495 n. 4 (5th Cir. 1979) (back pay only relief awarded where reinstatement claims dropped).

44. TAES simply cannot shield itself behind weak and tardy efforts to stop the discrimination which had been practiced against plaintiff. "[I]t is not a sufficient defense to racial discrimination to demonstrate that ineffective efforts were made to undo such discrimination." *Scott v. City of Anniston*, 597 F.2d 897, 902 (5th Cir. 1979).

until all discrimination is remedied constitutes the only effective deterrent to employer delay in implementing such a remedy. *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 358 (5th Cir. 1977) ("This may well be one case in which 'front pay' relief is factually compelled."). *See Kingsville Independent School District v. Cooper*, 611 F.2d 1109, 1114 (5th Cir. 1980) ("The usual award of back pay covers the period from wrongful termination to effective reinstatement.").

■ The court cannot now adequately compute back pay. Various factors such as the salary of Wells in the interim period and the probable salary of a white county agent in Panola County are unknown. These can, of course, be calculated, but the court would require more information to perform the calculation. The parties are directed to attempt to agree on these figures, and consequently the amount of back pay which is appropriate, if they can. If an agreement is reached, it should be offered to the court with the appropriate exhibits and affidavits. If an agreement cannot be reached, a hearing regarding back pay will be necessary.[45]

45. Plaintiff is entitled to receive interest on any award of back pay. *Whiting v. Jackson State University*, 616 F.2d 116, 127 n. 8 (5th Cir. 1980). To this end, the parties should attempt to agree on a figure representing an appropriate interest award on the back pay award on which they agree.

46. In Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), Congress provided, · in relevant part:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

47. In a lengthy paragraph too extensive to quote here, the Supreme Court has made abso-

*Injunctive Relief*[46]

■ The question of appropriate[47] injunctive relief is the most difficult question in this civil action.[48] Other elements of equitable relief sought by plaintiff are rather straight–forward and easily determined. Injunctive relief, however, involves more creative shaping of relief to meet the facts of this particular civil action. Plaintiff is entitled to reinstatement to an extension service position in Panola County devoid of the employment discrimination which he has previously undergone. The difficulty lies in the fact that no extension service is presently in operation in Panola County. However, the only factor preventing TAES from functioning in the county is the county's refusal to contribute financially to its operations. As indicated previously, that contribution is a *sine qua non* of TAES' performance of its work in the county. In order to accord fair and equitable relief, then, the county's financial contribution will be required.

■ In issuing an injunction, a court should consider and respect the interests of a local government in handling its own affairs. *Berry v. Cooper*, 577 F.2d 322, 323 n. 3 (5th Cir. 1978).[49] Nevertheless, it is neces-

lutely plain the obligation and power of federal courts "to fashion such relief as the particular circumstances of a case may require to effect restitution." *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763–64, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976).

48. Title VII injunctions are mandatory, absent clear and convincing evidence of future compliance with that statute's dictates. *James v. Stockham Valves & Fittings*, 559 F.2d 310 (5th Cir. 1977).

49. It is of fundamental importance to realize that a reluctance to intrude by federal courts into the affairs of local governments does not, in the least, impede the ordering and implementation of effective relief upon proof sufficient to trigger the court's *duty to so intervene*. *Cf. Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) (Once plaintiff has proved discharge based on race, "our traditional reticence to intervene in university affairs cannot be allowed to undermine our statutory duty to remedy the wrong."). Plaintiff's statutory access to the federal judicial forum has been secured by the national legislature for

sary to remedy the employment discrimination, based on race, exercised against plaintiff by Panola County. It appears that no less drastic course than ordering reinstatement of the service in the county can accomplish this end. It is important to note that TAES does not oppose this action by the court, and that the extension service's presence is important to the citizens of Panola County. The disingenuous assertions by the members of the Commissioners Court of Panola County that TAES did not benefit the citizens of the county was deficient in credibility, for the evidence established its vast importance to the populace. Moreover, the county bears a relatively small portion of the cost of TAES activity. By reason of three factors, the county will be ordered to resume appropriate contributions to assure TAES operations in Panola County: (1) the service is very important to county citizens; (2) the loss of county funds is responsible for the absence of the service in Panola County; and (3) the plaintiff and the service were expelled from the county pursuant to racial discrimination. *See Griffin v. County School Board*, 377 U.S. 218, 232–34, 84 S.Ct. 1226, 1233–35, 12 L.Ed.2d 256 (1964) (county may be required to raise funds and expend them to re–open school system discontinued for racial reasons).[50]

■ Once the county has resumed this funding, the question arises to what position Wells should be accorded. Wells was a county agent when he was discharged by TAES; therefore, he should receive that title at the least. Because the decision to appoint Ford—not Wells—as county chairman and county program leader came about as the direct result of racial discrimination, Wells should receive these titles, if he desires them. There being no county chairman or program leader presently in Panola County, awarding these titles to Wells does not take away from someone else.

The question of an appropriate salary for Wells is also presented. Immediately prior to the trial of this civil action, TAES entered into a consent decree ending discrimination in all extension service activity in the state.[51] In the decree, provision was made for determining TAES salaries on an objective basis. Since there is no evidence that TAES now discriminates in job assignment, promotion, or salary, it is sufficient to require that Wells be paid according to the bases the extension service now uses to determine agents' salaries.

■ Plaintiff also seeks a specific injunction which would prohibit discrimina-

exactly the reason that he may find himself discriminated against by a local, entrenched majority. A federal court's decision to circumvent the will of a local majority may seem intrusive, and may be, but it is nevertheless authorized and mandated, in order to guarantee the preservation of individual rights, deemed to be of the first order of magnitude.

**50.** In *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), the Supreme Court upheld a district court order mandating the institution of compensatory educational programs for children who had been subject to past acts of *de jure* segregation. In ordering the institution of such programs, the district court ordered the state and local governments to share the cost of the programs; specifically, the district court allocated these programs' cost between the state and local governments. *Milliken v. Bradley*, 433 U.S. 267, 278–79, 97 S.Ct. 2749, 2756, 53 L.Ed.2d 745 (1977). After a thorough discussion of the nature of the equitable power of federal courts in remedying educational segregation, the Court held that it was appropriate to order the institution of costly programs and to order the state and local

governments to share the cost of those programs. *Id.* at 288–90, 97 S.Ct. at 2761–62. Throughout its opinion, the Court relied upon the *Montgomery County* holding. *See, e. g., id.* at 287, 97 S.Ct. at 2760. Although *Montgomery County* and *Milliken* involved educational segregation, the language of those cases concerning the equitable power of federal courts to remedy unconstitutional conditions in general must be applicable in an employment discrimination context. Moreover, the abundant judicial language concerning the important national policy involved in ending employment discrimination certainly places the importance of ending that evil on an equal plane with educational segregation. Little is achieved if equality of opportunity is gained through equal education and lost again because of employer racism or discrimination.

**51.** In a July 24, 1976, consent decree, TAES adopted a satisfactory formula for determining an employee's salary and suitable criteria for hiring and promotion. *Poole v. Williams*, No. 72–H–150 (S.D.Tex.—Houston Division).

tion against him after reinstatement. In light of the consent decree mentioned above and the change in leadership in TAES, it does not appear that TAES will continue to discriminate against plaintiff. Therefore, TAES will not be so enjoined. *See Mayor v. Educational Equality League*, 415 U.S. 605, 622, 94 S.Ct. 1323, 1334, 39 L.Ed.2d 630 (1974) ("Where there have been prior patterns of discrimination by the occupant of a state executive office but an intervening change in administration, the issuance of prospective coercive relief against the successor to the office must rest, at a minimum, on supplemental findings of fact that the new officer will continue the practices of his predecessor."). The situation with respect to the county is different, however. It has not become a party to such a consent decree. Indeed, it has intentionally continued to practice rank discrimination, by refusing to fund TAES activity in the county. Its concerns have been purely focused on Wells' race. The county has not seen fit to follow civil rights legislation guaranteeing equal treatment for all persons in its employment. Indeed, for almost two decades, Harold Wells suffered demeaning discrimination at the hands of county officials shown to have been actuated by racial bias. These officials acted with a deliberate intent to discriminate; their actions were not accidental, nor were they merely neutral practices with uneven results. Although the county will be compelled to comply with the specific elements of injunctive relief already mentioned, these factors make appropriate a more general prohibition against discrimination by the county in its treatment of Harold Wells, for so long as he continues to be a county employee.

## IX.

### COSTS

 Plaintiff is entitled to recover the reasonable expenses he has incurred in pursuing this litigation to vindicate his rights. *Gates v. Collier*, 616 F.2d 1268 (5th Cir. 1980); *Whiting v. Jackson State University*, 616 F.2d 116 (5th Cir. 1980); *Northcross v. Board of Education*, 611 F.2d 624 (6th Cir.

1979); *Wheeler v. Durham City Board of Education*, 585 F.2d 618 (4th Cir. 1978). *See* 28 U.S.C. § 1920. At trial, plaintiff introduced an exhibit claiming total expenses of $1,490.74. This claim is entirely reasonable, and is substantiated by a detailed breakdown of expenditures, all of which are necessary and reasonable to assure efficient preparation. Indeed the total costs claimed thus far present great frugality; given the magnitude of this litigation, one would expect much greater expenditures. If there are subsequent expenditures which plaintiff feels should be recovered as costs, he may file a bill of costs in the ordinary manner.

## X.

### ATTORNEY'S FEES

 Title VII provides for an award of reasonable attorney's fees to prevailing parties.

> In any action or proceeding under this subchapter the court, in its discretion, may all allow the prevailing party . . . a reasonable attorney's fee as part of the costs, . . . .

42 U.S.C. § 2000e–5(k). In 1976, Congress provided for the recovery of attorney's fees by prevailing parties in Section 1981 and Section 1983 suits by enacting the Civil Rights Attorney's Fees Awards Act, which provides:

> In any action or proceeding to enforce a provision of [42 U.S.C. §§ 1981–86] . . . , the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988. *See Brown v. Culpepper*, 559 F.2d 274, 276–77 (5th Cir. 1977) ("It is beyond question that section 1988 as amended applies to suits brought pursuant to 42 U.S.C. § 1981 and 1983."). It cannot reasonably be doubted that plaintiff has prevailed on each of his causes of action; he has obtained all the relief sought. *See, e. g., Hanrahan v. Hampton*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *Knighton v. Watkins*, 616 F.2d 795 (5th Cir.

1980); *Fain v. Caddo Parish Police Jury*, 564 F.2d 707 (5th Cir. 1977); *Panior v. Iberville Parish School Board*, 543 F.2d 1117 (5th Cir. 1976). Accordingly, he is entitled to an award of attorney's fees unless "special circumstances would render such an award unjust." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968); Senate Report No. 94–1011, 94th Cong., 2nd Sess. 4, *reprinted in* (1976) U.S.Code Cong. & Admin.News, pp. 5908, 5912 (hereinafter "Senate Report", page citations to U.S.Code Cong. & Admin.News). *Accord, e. g., New York Gaslight Club, Inc. v. Carey*, —— U.S. ——, ——, 100 S.Ct. 2024, 2033, 64 L.Ed.2d 723 (1980); *International Oceanic Enterprises, Inc. v. Menton*, 614 F.2d 502 (5th Cir. 1980); *Johnson v. Mississippi*, 606 F.2d 635 (5th Cir. 1979); *Iranian Students Association v. Edwards*, 604 F.2d 352 (5th Cir. 1979); *Concerned Democrats of Florida v. Reno*, 601 F.2d 891 (5th Cir. 1979). There are no such special circumstances in this civil action; indeed, the facts affirmatively indicate that it would grossly distort the intent of Congress and affront justice not to award attorney's fees to plaintiff.[52]

■ TAES, a state agency is liable for attorney's fees, the eleventh amendment notwithstanding. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Defendant Hutchinson is liable in his official capacity, as such awards are treated as awards against the state. *Id., McNamara v. Moody*, 606 F.2d 621 (5th Cir. 1979); *Rainey v. Jackson State College*, 591 F.2d 1002 (5th Cir. 1979). Panola County is liable; if the eleventh amendment does not prevent an award of attorney's fees against the state, it certainly does not prevent such an award against a county. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). No award can be made against the Commissioners Court of Panola County, the individual commission-

ers, or the County Judge because they enjoy absolute legislative immunity precluding the award. *Supreme Court v. Consumers Union*, 446 U.S. 719, 738, 100 S.Ct. 1967, 1978, 64 L.Ed.2d 641 (1980).

More vexing is whether an award should be granted against defendant Hutchinson in his individual capacity. However, plaintiff has not urged that such an award be made. Consideration of the issue is, therefore, pretermitted. *See Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Moreover, such an award would be paid by the state. Tex.Rev.Civ.Code art. 6252–26.

■ It has now been determined that plaintiff is entitled by Title VII and Section 1988 to recover reasonable attorney's fees from all defendants except the individually named defendants in their individual capacities. It must now be decided what amount is reasonable. Plaintiff has produced testimony indicating that $60 per attorney hour, $5 per law clerk hour, and $750 per trial day constitutes a reasonable rate of compensation in this area of the country. Further, plaintiff has established that his attorney, Larry R. Daves, Esquire, spent 161⁵⁄₁₂ hours in preparation of litigation and five days in trial. Mr. Daves' law clerk spent thirty hours assisting in trial preparation. These time expenditures and rates of compensation appear to be reasonable in light of the twelve factors enumerated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) (considering attorney's fees pursuant to Title VII). *See Matter of First Colonial Corp.*, 544 F.2d 1291, 1299 (5th Cir. 1977) ("Although *Johnson* involved a suit brought under 42 U.S.C. § 2000e *et seq.*, the guidelines we established there are equally useful whenever the award of reasonable attorneys' fees is authorized by statute."). *Accord, Bunn v. The Central Realty of Louisiana*, 592 F.2d 891 (5th Cir. 1979); *Fain v. Caddo Parish Police Jury*, 564 F.2d 707 (5th Cir. 1977); *Rainey v. Jackson State College*,

---

**52.** It is unimportant that this civil action was filed prior to the enactment and effective date of section 1988. First, Title VII itself permits the attorney's fees granted herein. Second, Section 1988 permits the award of attorney's

fees in all civil actions pending on the date of enactment, as was this civil action. *See Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Corpus v. Estelle*, 605 F.2d 175 (5th Cir. 1979).

551 F.2d 672 (5th Cir. 1977). These twelve factors will be considered, *seriatim.*

1. *The time and labor required.* Mr. Daves, plaintiff's attorney, testified that plaintiff's exhibit 21 accurately reflects the amount of time he spent preparing this action for trial. As already stated, the total time expended amounts to 161⁵/₁₂ hours, and that total is broken down with a specific description of the exact amount expended on a particular task on a particular date. Plaintiff's attorney's records appear to be detailed and complete. From the court's intimate acquaintance with this litigation, its close scrutiny of the record, and the unquestionable veracity of plaintiff's attorney, the court is convinced that the time claimed is reasonable and represents an efficient use of time. Further, the time claimed was actually expended and was necessary for a successful and adequate presentation of the difficult issues presented in this civil action. Since the time claimed was expended by only one attorney, there appears to be no duplication of services contained in the time breakdown. "If anything, the hourly estimates appear unrealistically low." *Cruz v. Beto,* 453 F.Supp. 905, 909 (S.D.Tex.), *aff'd,* 603 F.2d 1178 (5th Cir. 1979). Finally, plaintiff's claim for compensation for his attorney for four days spent in the trial of this civil action is quite reasonable. Presentation of testimony was expeditious and non–repetitive. Plaintiff's counsel carefully orchestrated his witnesses and efficiently presented the plaintiff's case. There can be no question of useless delay or inefficiency on this score.

2. *The novelty and difficulty of the questions.* This civil action involved an individual plaintiff. It is true that many such employment discrimination suits are class actions, involving a great deal more complexity. Yet, this action presented very abstruse problems. Defendants were intransigent. The facts were difficult to marshal. The question of remedy in light of the termination of extension services in a county was novel. It cannot be said that this was a simple lawsuit. Whether or not plaintiff's counsel was charting new territory, he certainly found himself traversing

rugged terrain. It was previously indicated that plaintiff's counsel claimed a reasonable number of hours in presenting his time expenditures. These hours were reasonable, precisely because of the novelty and difficulty of the questions presented.

3. *The skill required properly to represent plaintiff.* This civil action demanded, and the plaintiff's attorney demonstrated, skill, dedication, determination, and ability. Preparation of the facts in this action was enormously difficult. Contouring those facts within an acceptable legal framework required experience and ability.

4. *The preclusion of other employment by plaintiff's attorney's acceptance of this action.* No evidence was offered on this point. There is no apparent reason in this action why this factor should play an important part in determining a reasonable fee.

5. *The customary fee.* Plaintiff's counsel has requested a fee of $60 per hour and $750 per trial day. Plaintiff presented expert testimony indicating that these fees were reasonable. This testimony was unrebutted. Moreover, the fees appear to be reasonable to the court. They are consonant with the prevailing rate in this community and appropriate in light of the other factors detailed in this portion of the order.

6. *Awards in similar cases.* The rate of compensation requested is consistent with fees approved in other recent cases. *See, e. g., Northcross v. Board of Education,* 611 F.2d 624 (6th Cir. 1979) (experienced counsel received $125 per hour for trial work and $75 for all other work; less experienced counsel received $40 per trial hour and $60 per hour for other services); *Harkless v. Sweeney Independent School District,* 608 F.2d 594 (5th Cir. 1979) ($75 per hour for all services; total award of $256,500); *Corpus v. Estelle,* 605 F.2d 175 (5th Cir. 1979) ($90 per trial and appellate hour and $75 per preparation hour; total award of $48,845); *Brown v. Culpepper,* 559 F.2d 274 (5th Cir. 1877) ($75 per trial hour and $65 per preparation hour); *Wolf v. Frank,* 555 F.2d 1213 (5th Cir. 1977) (experience counsel received $150 per trial hour and $100 per preparation hour; less experienced counsel received $100 per trial hour and $75 per preparation

hour); *Pugh v. Rainwater*, 465 F.Supp. 41 (S.D.Fla.1979) ($90 per hour for all work; total award of $55,372.50); *Cruz v. Beto*, 453 F.Supp. 905 (S.D.Tex.1979) (lead counsel received $90 per trial hour, $75 per preparation hour, and $35 per hour for informal communications; other counsel received $70 and $50 per trial hour, $60 and $40 per preparation hour, and $35 per hour for informal communications).

7. *Time limitations imposed by client or circumstances.* This does not appear to be a particularly strong factor in this instance. Plaintiff's attorney certainly put a great many hours of preparation into this case. Nevertheless, there is no evidence that his handling of matters involved in this action was of such priority that other office matters suffered from delay or that legal business had to be turned away.

8. *The experience, reputation, and ability of the attorney.* Plaintiff's attorney is probably the most experienced employment discrimination lawyer in East Texas. His dedication in handling unpopular cases involving allegations of employment discrimination is unmatched in this geographic area.

9. *The undesirability of the case.* Plaintiff set his face against those who govern Panola County, and his lawyer joined him in this cause. By nature, it was unpopular. There was considerable public sentiment in opposition to plaintiff's position in this civil action. Although Mr. Daves does not practice law strictly in Panola County, his unpopularity in this East Texas County is bound to diminish his popularity in all of East Texas. The only desirable aspect of this case from the perspective of plaintiff's attorney was the opportunity to attain justice for a victim of racial prejudice and discrimination.

10. *The nature and length of the professional relationship with plaintiff.* There was no evidence on this point, and there is no reason why this factor, in this action, should cause the fee to be increased or diminished.

11. *The amount involved and the results obtained.* Plaintiff received all the relief he requested. Although not a class action, the resolution of this lawsuit should be instrumental in relieving the effects of racial prejudice in Panola County. Moreover, the citizens of Panola County will again be benefited by an agricultural extension service, a most important item in the rural Panola County community. These non-pecuniary aspects of relief are important in determining an appropriate fee. *Knighton v. Watkins*, 616 F.2d 795 (5th Cir. 1980). Finally, the attorney's fee award is a reasonable percentage of the back pay award. Although that award can not presently be determined precisely, it will doubtlessly be significant. Consideration of all the relief accorded plaintiff clearly justifies the attorney's fee requested.

■ 12. *Whether the fee is fixed or contingent.* It is apparent on the record that plaintiff has no obligation to pay attorney's fees and that plaintiff's counsel's right to a fee will only be realized through a court award. When plaintiff's counsel accepted this case, his prospect of recovery was totally dependent upon victory and a court award. Moreover, at the outset of this litigation, it was not at all obvious that plaintiff, as prevailing party, would be entitled to attorney's fees.

Accordingly, the attorney's fees recovered by plaintiff in this case should be enhanced by a factor of two. *See e. g., Knighton v. Watkins, supra; Northcross v. Board of Education of Memphis City Schools, supra; Wolf v. Frank*, 555 F.2d 1213 (5th Cir. 1977); *Miller v. Mackey International, Inc.*, 515 F.2d 241 (5th Cir. 1975); *Stanford Daily v. Zurcher, supra.*

■ Consideration of the twelve foregoing factors make plain the propriety of the fee requested. Item-by-item scrutiny of the hourly entries offered to the court indicate that plaintiff's attorney did not duplicate effort or charge for non-attorney labor.[53] The unremitting recalcitrance of

---

**53.** If the exhibit presented by plaintiff indicating the total number of hours spent by an attorney preparing and trying this civil action does not include hours spent in seeking an

attorney's fee or hours spent in briefing after the end of the trial, plaintiff's attorney is free to submit additional affidavits indicating these other hours. As with the back pay issue, if

defendants in this lawsuit and the prospect of receiving no fee at all for handling the lawsuit also makes appropriate an enhanced award to plaintiff's attorney. The fee, $10,492.08, enhanced by a factor of two, equals $20,984.16.[54]

## APPENDIX
## CHART

| YEAR | EMPLOYEE | RACE | STATE | FEDERAL | COUNTY | TOTAL |
|---|---|---|---|---|---|---|
| Sept. 68–Aug. 69 | Alfred Croix | Cauc. | 4620 | 3564 | 3286 | 11470 |
| | Harold Wells | Black | 4200 | 2880 | 1240 | 8320 |
| | Dorothy Hopkins | Cauc. | 4620 | 2940 | 2720 | 10280 |
| | Velma Waters | Black | 3600 | 2028 | 1000 | 6628 |
| Sept. 69–Aug. 70 | Alfred Croix | Cauc. | 4920 | 3984 | 3612 | 12516 |
| | Harold Wells | Black | 4500 | 3180 | 1356 | 9036 |
| | Position Vacant | | | | | |
| | Velma Waters | Black | 4500 | 1416 | 1092 | 7008 |
| Sept. 70–Aug. 71 | Alfred Croix | Cauc. | 5700 | 4584 | 3612 | 13896 |
| | Harold Wells | Black | 5100 | 3840 | 1356 | 10296 |
| | Donna Tanner | Cauc. | 5700 | 1356 | 2988 | 10044 |
| | Velma Waters | Black | 5100 | 2076 | 1092 | 8260 |
| Sept. 71–Aug. 72 | Alfred Croix | Cauc. | 6300 | 4704 | 3612 | 14616 |
| | Harold Wells | Black | 5700 | 4140 | 1356 | 11196 |
| | Tempie Brunson | Cauc. | 6000 | 1356 | 3000 | 10356 |
| | Velma Waters | Black | 5700 | 2256 | 1092 | 9048 |
| Sept. 72–Aug. 73 | Gordon Ford | Cauc. | 6960 | 4524 | 4000 | 15484 |
| | Harold Wells | Black | 6300 | 4500 | 1500 | 12300 |
| | Tempie Brunson | Cauc. | 6300 | 1896 | 3300 | 11496 |
| | Velma Waters | Black | 6300 | 2556 | 1200 | 10056 |
| Sept. 73–Aug. 74 | Gordon Ford | Cauc. | 8400 | 3612 | 4188 | 16200 |
| | Harold Wells | Black | 8400 | 2988 | 1572 | 12960 |
| | Tempie Brunson | Cauc. | 7200 | 1560 | 3480 | 12240 |
| | Velma Waters | Black | 7200 | 2004 | 1272 | 10476 |

defendants cannot agree with plaintiff's attorney concerning these hours, it may be necessary to conduct an additional hearing. If the parties do agree concerning this matter, plaintiff will receive attorney's fees for those hours at the rate specified in the above text (including enhancement). *See Johnson v. State*, 606 F.2d 635, 638–39 (5th Cir. 1979).

54. Plaintiff is entitled to post–judgment interest on the award of attorney's fees, *Gates v. Collier*, 616 F.2d 1268, 1272–79 (5th Cir. 1980), and such interest will be awarded to effectuate the benign, remedial purposes of the civil rights legislation involved in this civil action.